**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

CASE NO.: 0:22-cv-61154

PEMBROKE POINTE OFFICE, LLC,

     Plaintiff,

v.

LUCIDITY LIGHTS, INC.,

     Defendant.

_____/

## COMPLAINT

Plaintiff, Pembroke Pointe Office, LLC ("Pembroke Pointe"), sues Defendant, Lucidity Lights, Inc. ("Lucidity"), and alleges:

## NATURE OF ACTION

1.      This is an action for breach of a lease agreement between Pembroke Pointe, as landlord, and Lucidity, as tenant, for Suite 100 of the building located at 880 SW 145 Ave, Pembroke Pines, Florida 33027 (the "Premises").

## THE PARTIES, JURISDICTION, AND VENUE

2.      This Court has subject matter jurisdiction of this matter under 28 U.S.C. § 1332, as it is a controversy between citizens of different and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

3.      Pembroke Pointe is a Florida limited liability company, having its principal place of business in Miami, Florida.

4.      Lucidity is a Delaware corporation, having its principal place of business in Boston, Massachusetts.

5.      Venue properly lies in this Court under 28 U.S.C. § 1391(b)(1), as a substantial part of the events or omissions giving rise to the claim occurred in this district—i.e., Lucidity's failure to make payments to Pembroke Pointe under the lease for the Premises—and the Premises is located in this judicial district.

## BREACH OF LEASE

6.      On March 10, 2017, Lucidity's predecessor-in-interest, Evolution Lighting, LLC ("Evolution"), entered into a written commercial lease agreement (the "Lease") with Pembroke Pointe's predecessor-in-interest, Duke Realty Limited Partnership ("Duke Realty"), to lease the Premises. A copy of the Lease is attached as **Exhibit 1**.

7.      On June 15, 2020, Pembroke Pointe and Lucidity entered into the First Amendment to Lease, acknowledging that Pembroke Pointe succeeded to all right, title, and interest of Duke Realty as the landlord under the Lease, and that Lucidity succeeded to all right, title, and interest of Evolution as the tenant under the Lease. A copy of the First Amendment to Lease is attached as **Exhibit 2**.

8.      Pursuant to the Lease, as amended, Lucidity agreed to pay monthly base rent, plus applicable sales taxes, common area maintenance expenses, and estimated tax payments.

9.      Lucidity defaulted on the Lease by failing to pay the rent and other expenses due for the month of January 2022 and all subsequent months.

10.     On January 26, 2022, Pembroke Pointe served Lucidity with a written notice to pay rent or deliver possession of the Premises, a true and correct copy of which is attached hereto as **Exhibit 3** (the "Default Notice").

11.     Notwithstanding the Default Notice, Lucidity has failed to pay rent and other expenses due under the Lease. Instead, Lucidity abandoned the Premises in or around February 2022.

12.     Pembroke Pointe fully performed its obligations under the Lease.

13.     Lucidity materially breached the Lease by, among other things, failing to pay the rent and other expenses due to Pembroke Pointe under the Lease, since January 2022.

14.     As a result of Lucidity's defaults and breaches of the Lease, including its abandonment of the Premises, Pembroke Pointe has suffered damages in excess of $75,000.00, exclusive of interest, costs, and attorneys' fees.

15.     All conditions precedent to the bringing of this action have occurred, been performed, or have been waived.

16.     The Lease and applicable law provide for the recovery of reasonable attorneys' fees and costs. *See* Ex. 1; *see also* § 83.231, Fla. Stat.

17.     Pembroke Pointe has retained the law firm of Peterson, Baldor & Maranges, PLLC to represent it in this action and has agreed to pay it reasonable fees and expenses for these services.

**WHEREFORE**, Pembroke Pointe demands judgment in favor of Pembroke Pointe and against Lucidity for damages, including all amounts due from Lucidity under the Lease, interest, costs, late fees, and attorneys' fees, plus such other and further relief as the Court deems just and proper.

Respectfully submitted,

**PETERSON, BALDOR &
MARANGES, PLLC**
*Attorneys for Pembroke Pointe
Office LLC*
8000 SW 117 Ave, Ste 206
Miami, FL 33183
Telephone: (305) 270-3773

By:   <u>/s/ Matthew Maranges, B.C.S.</u>
Florida Bar No.: 91834
Matt@pbmlegal.net
Brittany@pbmlegal.net
Ceasar X. Delgado, B.C.S.
Florida Bar No.: 98483
Ceasar@pbmlegal.net
Jessica@pbmlegal.net

# Exhibit "1"

## OFFICE LEASE

THIS OFFICE LEASE (this "Lease") is executed this _10th_ day of _March_, 2017, by and between DUKE REALTY LIMITED PARTNERSHIP, an Indiana limited partnership ("Landlord"), and EVOLUTION LIGHTING, LLC, a Delaware limited liability company ("Tenant").

## ARTICLE 1 - LEASE OF PREMISES

Section 1.01.  Basic Lease Provisions and Definitions.

(a)        "Leased Premises" (shown outlined on **Exhibit A** attached hereto and made a part hereof):  Suite 100 of the building (the "Building") located at 880 Southwest 145th Avenue, Pembroke Pines, Florida 33027, within Pembroke Pointe (the "Park").

(b)        "Rentable Area":  approximately 9,684 rentable square feet.  The Rentable Area includes the square footage within the Leased Premises plus a pro rata portion of the square footage of the Common Areas (as defined in Section 1.02 below) within the Building, as reasonably determined by Landlord.

(c)        "Tenant's Proportionate Share":  6.75% (based on 9,684 rentable square feet within the Leased Premises divided by the 143,535 rentable square feet within the Building).

(d)        "Minimum Annual Rent":

| | |
|---|---|
| Year 1 | $124,278.00 |
| Year 2 | $219,439.44 |
| Year 3 | $226,024.56 |
| Year 4 | $232,803.36 |
| Year 5 | $239,775.84 |
| Year 6 | $246,942.00 |
| Year 7 | $254,398.68 |
| Year 8 | $109,187.10 |

(e)        "Monthly Rental Installments":

| | |
|---|---|
| Months 1 – 5 | $      0.00 |
| Months 6 – 12 | $17,754.00 |
| Months 13 – 24 | $18,286.62 |
| Months 25 – 36 | $18,835.38 |
| Months 37 – 48 | $19,400.28 |
| Months 49 – 60 | $19,981.32 |
| Months 61 – 72 | $20,578.50 |
| Months 73 – 84 | $21,199.89 |
| Months 85 – 89 | $21,837.42 |

(Note:  Monthly Rental Installments do not include applicable Sales Tax or Additional Rent, which sums shall be paid by Tenant pursuant to the further provisions of this Lease.)

(f)        Intentionally Omitted.

1

(g)     "Target Commencement Date":  September 1, 2017.

(h)     "Lease Term":  Seven (7) years and five (5) months.

(i)     "Security Deposit":  $106,524.00 in the form of a Letter of Credit (as defined in Section 4.01 below).

(j)     "Broker(s)":  Cushman & Wakefield of Florida, Inc. and Duke Realty Services, LLC each representing Landlord and Continental Real Estate Companies, Inc. representing Tenant.

(k)     "Permitted Use":  General office purposes.

(l)     Address for notices and payments are as follows:

| | |
|---|---|
| Landlord: | Duke Realty Limited Partnership<br>c/o Duke Realty Corporation<br>Attn:    Florida Market, Vice President,<br>Asset Management & Customer Service<br>2400 North Commerce Parkway, Suite 405<br>Weston, FL  33326 |
| With Payments to: | Duke Realty Limited Partnership<br>75 Remittance Drive, Suite 3205<br>Chicago, IL  60675-3205 |
| Tenant (prior to occupancy): | Evolution Lighting, LLC<br>Attn.: Wilfredo Figueras, CFO<br>16200 Northwest 59th Avenue, Suite 101<br>Miami Lakes, FL 33014 |
| Tenant (following occupancy): | Evolution Lighting, LLC<br>Attn.: Wilfredo Figueras, CFO<br>880 Southwest 145th Avenue, Suite 100<br>Pembroke Pines, FL 33027 |
| With a copy to: | Greenberg Traurig, P.A.<br>Attn.: Ilene K. Kobert, Esq.<br>333 Avenue of the Americas<br>Miami, FL 33131 |

(m)     "Guarantor(s)":  None.

(n)     Exhibits:

| | |
|---|---|
| Exhibit A: | Site Plan of Leased Premises |
| Exhibit B: | Tenant Improvements |
| Exhibit B-1: | Scope of Work |
| Exhibit C: | Form of Letter of Understanding |

2

Exhibit D:      Rules and Regulations
Exhibit E:      Form of Letter of Credit

Section 1.02.  Lease of the Leased Premises.  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Leased Premises, under the terms and conditions herein, together with a non-exclusive right, in common with others, to use the following (collectively, the "Common Areas"): the areas of the Building and the related land and improvements thereto, including, without limitation, driveways, parking areas and sidewalks, that are designed for use in common by all tenants of the Building and their respective employees, agents, contractors, representatives, customers, guests, invitees and others.

## ARTICLE 2 - LEASE TERM AND POSSESSION

Section 2.01.  Lease Term.  The Lease Term shall commence as of the date (the "Commencement Date") that is fourteen (14) days following the date that Substantial Completion (as defined in **Exhibit B** hereto) of the Tenant Improvements (as defined in Section 2.02 below) occurs.

Section 2.02.  Construction of Tenant Improvements.  Landlord shall construct and install all leasehold improvements to the Leased Premises (collectively, the "Tenant Improvements") in accordance with **Exhibit B** attached hereto and made a part hereof.

Section 2.03.  Surrender of the Leased Premises.  Upon the expiration or earlier termination of this Lease, Tenant shall, at its sole cost and expense, immediately (a) surrender the Leased Premises to Landlord in broom-clean condition and in good order, condition and repair, (b) remove from the Leased Premises or where located (i) Tenant's Property (as defined in Section 8.01 below), (ii) all data and communications equipment, wiring and cabling (including above ceiling, below raised floors and behind walls) installed by or on behalf of Tenant, and (iii) any alterations required to be removed pursuant to Section 7.03 below, and (c) repair any damage caused by any such removal and restore the Leased Premises to the condition existing upon the Commencement Date, reasonable wear and tear and casualty excepted.  Upon the expiration or earlier termination of this Lease, all of Tenant's Property that is not removed within ten (10) days following Landlord's written demand therefor shall be conclusively deemed to have been abandoned and Landlord shall be entitled to dispose of Tenant's Property at Tenant's cost, without incurring any liability to Tenant.  This Section 2.03 shall survive the expiration or any earlier termination of this Lease.

Section 2.04.  Holding Over.  If Tenant retains possession of the Leased Premises after the expiration or earlier termination of this Lease, Tenant shall be a tenant at sufferance at one hundred fifty percent (150%) of the Monthly Rental Installments and one hundred percent (100%) of the Annual Rental Adjustment (as hereinafter defined) for the Leased Premises in effect upon the date of such expiration or earlier termination, and otherwise upon the terms, covenants and conditions herein specified, so far as applicable.  Acceptance by Landlord of Rent (as defined in Section 3.03 below) after such expiration or earlier termination shall not result in a renewal of this Lease, nor shall such acceptance create a month-to-month tenancy.  In the event a month-to-month tenancy is created by operation of law, either party shall have the right to terminate such month-to-month tenancy upon thirty (30) days' prior written notice to the other, whether or not said notice is given on the date that any Rent is due.  This Section 2.04 shall not be deemed a consent by Landlord to any holding over by Tenant upon the expiration or earlier termination of this Lease, nor limit Landlord's remedies in such event.

## ARTICLE 3 - RENT

Section 3.01.  Rent.  Commencing as of the first day of the sixth (6th) month following the Commencement Date, Tenant shall pay to Landlord the Minimum Annual Rent in the amounts of the Monthly Rental Installments set forth in Section 1.01(e) above, plus applicable sales tax for the State of Florida ("Sales Tax"), in advance, without demand, abatement, counterclaim, recoupment, deduction or offset, on the Commencement Date, and, thereafter, on or before the first day of each and every calendar month thereafter during the Lease Term.  The Monthly Rental Installments for partial calendar months shall be prorated on the basis of the total number of days in the applicable calendar month.  Tenant shall be responsible for delivering the Monthly Rental Installments to the payment address set forth in Section 1.01(l) above in accordance with this Section 3.01.

Section 3.02.  Annual Rental Adjustment Definitions.

(a)  "Annual Rental Adjustment": the amount of Tenant's Proportionate Share of Operating Expenses for a particular calendar year, plus Sales Tax.

(b)  "Operating Expenses": the amount of all of Landlord's costs and expenses paid or incurred in operating, repairing, replacing and maintaining the Building and the Common Areas in good condition and repair for a particular calendar year (including all additional costs and expenses varying on the basis of occupancy that Landlord reasonably determines that it would have paid or incurred during such year if the Building had been fully occupied), including by way of illustration and not limitation, the following: all Real Estate Taxes (as defined in Section 3.02(d) below), insurance premiums and deductibles; water, sewer, electrical and other utility charges other than the separately billed electrical and other utility charges paid by Tenant pursuant to this Lease (or paid by other tenants in the Building); service and other charges incurred in the repair, replacement, operation and maintenance of the elevators and the heating, ventilation and air-conditioning ("HVAC") system; costs associated with providing fitness and/or conference facilities, if any; cleaning and other janitorial services; tools and supplies; repair costs; landscape maintenance costs; access patrols; license, permit and inspection fees; management fees (which shall not exceed 5% of the gross rents for the Building); administrative fees; supplies, costs, wages and related employee benefits payable for the management, maintenance and operation of the Building; maintenance, repair and replacement of the driveways, parking and sidewalk areas, landscaped areas, and lighting; and maintenance and repair costs, dues, fees and assessments incurred under the Declaration (as hereinafter defined) or charged by any owners association.  The cost of any Operating Expenses that are capital in nature ("Capital Expenses") shall be amortized over the expected useful life of the improvement (as reasonably determined by Landlord in accordance with generally accepted accounting principles), and in each calendar year of the Lease Term only the amortized portion of such Capital Expenses shall be included, and such amortized portion shall be prorated with respect to any partial calendar year during the Lease Term.  Operating Expenses shall be net only and for that purpose shall be deemed reduced by the amount of all reimbursements, recoupment, payments, discounts, credits, reductions, allowances, or the like received or receivable by Landlord in connection with Operating Expenses.  Notwithstanding the foregoing, Operating Expenses shall not include the following:

(i)  the cost of repairs to the Building, including the Leased Premises, to the extent the cost of such repairs is reimbursed by insurance or condemnation proceeds;

(ii)  leasing commissions paid to agents of Landlord, other brokers or any other persons in connection with the leasing of space in the Building;

4

(iii)     the cost of improving or renovating space for tenants (including Tenant) or space vacated by an tenant (including Tenant);

(iv)     the cost of utilities charged to individual tenants (including Tenant) and payroll, material and contract costs of other services charged to tenants (including Tenant);

(v)     the cost of painting and decorating the Leased Premises or premises of other tenants;

(vi)     depreciation of the Building and other real property structures in the Park;

(vii)     ground lease payments, principal, interest, points and other charges and fees on debt or amortization payments on any mortgages on the Park or any part thereof;

(viii)     legal and other related expenses associated with the negotiation or enforcement of leases or the defense of (A) Landlord's title to the Building, the underlying land or other portions of the Common Areas or Park, or (B) any action based solely on an alleged breach by Landlord or a lease pertaining to space in the Building;

(ix)     advertising costs incurred directly for leasing individual space in the Building or Common Areas;

(x)     Landlord's general corporate overhead and Landlord's general administrative expenses not directly related to the operation of the Park;

(xi)     costs of wages, salaries, or other compensation paid to any executive employees of Landlord above the grade of "Vice President, Asset Management and Customer Service" or paid to employees of Landlord who are not employed full time, on site at the Building; provided, however, if an employee of Landlord works on several buildings within the area, including the Building, the costs and expenses incurred in connection with such employee shall be allocated among such buildings by Landlord in accordance with reasonable and consistent criteria;

(xii)     all items and services for which Tenant or any other tenant of the Building reimburses Landlord (other than as Operating Expenses), provided that any item or service supplied selectively to Tenant shall be paid for by Tenant;

(xiii)     amounts paid to any party that is related to, or a division or affiliate of Landlord, providing materials, services, labor or equipment to the extent that such amounts materially exceed the competitive costs of such materials, services, labor or equipment when provided by an independent party in an arm's length transaction;

(xiv)     the costs incurred to test, survey, cleanup, contain, abate, remove, or otherwise remedy asbestos-containing materials or other materials from the Building or Common Areas that have been classified as "Hazardous Substances" under Environmental Laws (as defined under Section 15.01(a) of the Lease) as of the date of this Lease;

(xv)     interest, penalties or other costs arising out of Landlord's failure to make timely payment of any obligations of Landlord related to the Building or Park;

(xvi)   any costs, fines or penalties imposed due to Landlord's negligent actions or omissions or violation of Laws that would not have been incurred but for such negligent action or omission or violation by Landlord;

(xvii)   costs for sculptures, painting and other objects of art located in the interior or exterior of the Building, the Common Areas or within the Park;

(xviii)   charitable or political contributions; and

(xix)   expenditures for repairs or maintenance that are covered by warranties, guarantees or service contracts and that are made without cost to Landlord.

(c)   "Tenant's Proportionate Share of Operating Expenses": an amount equal to the product obtained by multiplying Tenant's Proportionate Share by the Operating Expenses for the applicable calendar year.

(d)   "Real Estate Taxes": any form of real estate tax or assessment or service payments in lieu thereof or water or sewer tax or charges, and any license fee, commercial rental tax, improvement bond, charges in connection with an improvement district or other similar charge or tax imposed upon the Building or Common Areas, or against Landlord's business of leasing the Building, by any authority having the power to so charge or tax, which shall be based on the maximum available discount for early payment regardless of when Landlord elects to pay such Real Estate Taxes, together with reasonable costs and expenses of contesting the validity or amount of the Real Estate Taxes; provided, however, that Real Estate Taxes shall not include any municipal, state or federal income, capital levy, estate, succession, inheritance, gift, franchise, mortgage recording, sales or other transactional tax or transfer taxes of Landlord or any income, profit or revenue tax or charge imposed upon the rent received by Landlord under this Lease.

Section 3.03.   Payment of Additional Rent.

(a)   Any amount required to be paid by Tenant hereunder (other than Minimum Annual Rent) and any charges or expenses incurred by Landlord on behalf of Tenant under the terms of this Lease shall be considered "Additional Rent" payable in the same manner and upon the same terms and conditions as the Minimum Annual Rent reserved hereunder, except as set forth herein to the contrary.  Minimum Annual Rent and Additional Rent are sometimes referred to herein, collectively, as "Rent". Notwithstanding the foregoing, Landlord and Tenant acknowledge and agree that (i) any excess costs incurred by Tenant and payable to Landlord in connection with the construction and installation of the Tenant Improvements (the "Excess Costs") shall not be considered Additional Rent under this Lease, (ii) neither party shall record Excess Costs as rental income or rental expense on its respective books and records, (iii) Tenant is not obligated to incur Excess Costs under this Lease, and (iv) the portion of the Tenant Improvements related to the Excess Costs are solely for Tenant's own use and benefit and the Excess Costs are in addition to, not in lieu of, the market rental rate charged by Landlord to Tenant under this Lease.

(b)   In addition to the Minimum Annual Rent specified in this Lease, commencing as of the first day of the fifth (5th) month following the Commencement Date, Tenant shall pay to Landlord as Additional Rent for the Leased Premises, in each calendar year or partial calendar year during the Lease Term, an amount equal to the Annual Rental Adjustment for such calendar year.  Landlord shall estimate the Annual Rental Adjustment annually, and written notice thereof shall be given to Tenant prior to the

beginning of each calendar year. Tenant shall pay to Landlord each month, at the same time the Monthly Rental Installment is due, an amount equal to one-twelfth (1/12) of the estimated Annual Rental Adjustment. Tenant shall be responsible for delivering the Additional Rent to the payment address set forth in Section 1.01(l) above in accordance with this Section 3.03. If Operating Expenses increase during a calendar year, Landlord may increase the estimated Annual Rental Adjustment during such calendar year by giving Tenant written notice to that effect, and thereafter Tenant shall pay to Landlord, in each of the remaining months of such calendar year, an amount equal to the amount of such increase in the estimated Annual Rental Adjustment divided by the number of months remaining in such calendar year. Within a reasonable time after the end of each calendar year, Landlord shall prepare and deliver to Tenant a statement showing the actual Annual Rental Adjustment for such calendar year. If the estimated Annual Rental Adjustment payments made by Tenant are less than the actual Annual Rental Adjustment, then Tenant shall pay to Landlord the difference between the actual Annual Rental Adjustment for the preceding calendar year and the estimated payments made by Tenant during such calendar year within thirty (30) days after receipt of the aforementioned statement. In the event that the estimated Annual Rental Adjustment payments made by Tenant are greater than the actual Annual Rental Adjustment, then Landlord shall credit the amount of such overpayment toward the next Monthly Rental Installment(s) and the next monthly estimated Annual Rental Adjustment payment(s) due under this Lease until such overpayment is recovered by Tenant in full (or remit such amount to Tenant in the event that this Lease shall have expired or terminated). This Section 3.03 shall survive the expiration or any earlier termination of this Lease.

Section 3.04. Late Charges. Tenant acknowledges that Landlord shall incur certain additional unanticipated administrative and legal costs and expenses if Tenant fails to pay timely any payment required hereunder. Therefore, in addition to the other remedies available to Landlord hereunder, if any payment required to be paid by Tenant to Landlord hereunder shall become overdue, such unpaid amount shall bear interest from the due date thereof to the date of payment at the prime rate of interest, as reported in the Wall Street Journal (the "Prime Rate") plus six percent (6%) per annum; provided, however, such interest rate shall not be less than twelve percent (12%) per annum.

Section 3.05. Maximum Increase in Operating Expenses. Notwithstanding anything in this Lease to the contrary, Tenant will be responsible for Tenant's Proportionate Share of Real Estate Taxes, insurance premiums, utilities, management fees (subject to the cap set forth in Section 3.02(b) above), and charges assessed against the Building pursuant to the Declaration ("Uncontrollable Expenses"), without regard to the level of increase in any or all of the above in any year or other period of time. Tenant's obligation to pay Tenant's Proportionate Share of Operating Expenses that are not Uncontrollable Expenses (herein "Controllable Expenses") shall be limited to a five percent (5%) per annum increase over the amount the Controllable Expenses per rentable square foot for the immediately preceding calendar year would have been had the Controllable Expenses per rentable square foot increased at the rate of five percent (5%) in all previous calendar years beginning with the actual Controllable Expenses per rentable square foot for the calendar year ending December 31, 2018. Notwithstanding the foregoing, to the extent there is a material change in immigration laws, an increase in the current minimum wage (as of the date of this Lease) or the unionization of the labor force (collectively, the "Uncontrollable Events") that actually impacts the cost of janitorial services or landscaping for the Building beyond the standard cost increases over time as a result of inflation, then the portion of such cost increase relating to the Uncontrollable Events (but excluding, the inflationary increases or costs not relating to the Uncontrollable Events) would not be subject to the five percent (5%) cap and Tenant shall pay Tenant's Proportionate Share of such costs in the same manner as the other Uncontrollable Expenses.

Section 3.06.  Inspection and Audit Rights.

(a)     Tenant shall have the right to inspect, at reasonable times and in a reasonable manner, during the ninety (90) day period following the delivery of Landlord's statement of the actual amount of the Annual Rental Adjustment (the "Inspection Period"), such of Landlord's books of account and records as pertain to and contain information concerning the Annual Rental Adjustment for the prior calendar year in order to verify the amounts thereof.  Such inspection shall take place at Landlord's office upon at least fifteen (15) days prior written notice from Tenant to Landlord.  Only Tenant or a certified public accountant that is not being compensated for its services on a contingency fee basis shall conduct such inspection.  Tenant shall also agree to follow Landlord's reasonable procedures for auditing such books and records.  Landlord and Tenant shall act reasonably in assessing the other party's calculation of the Annual Rental Adjustment.  Tenant shall provide Landlord with a copy of its findings within thirty (30) days after completion of the audit.  Tenant's failure to exercise its rights hereunder within the Inspection Period shall be deemed a waiver of its right to inspect or contest the method, accuracy or amount of such Annual Rental Adjustment.

(b)     If Landlord and Tenant agree that Landlord's calculation of the Annual Rental Adjustment for the inspected calendar year was incorrect, the parties shall enter into a written agreement confirming such undisputed error and then Landlord shall make a correcting payment in full to Tenant within thirty (30) days after the determination of the amount of such error or credit such amount against future Additional Rent if Tenant overpaid such amount, and Tenant shall pay Landlord within thirty (30) days after the determination of such error if Tenant underpaid such amount.  In the event of any errors on the part of Landlord that Landlord agrees were errors costing Tenant in excess of five percent (5%) of Tenant's actual Operating Expense liability for any calendar year, Landlord will also reimburse Tenant for the costs of an audit reasonably incurred by Tenant in an amount not to exceed $2,500 within the above thirty (30) day period.  If Tenant provides Landlord with written notice disputing the correctness of Landlord's statement, and if such dispute shall have not been settled by agreement within thirty (30) days after Tenant provides Landlord with such written notice, Tenant may submit the dispute to a reputable firm of independent certified public accountants selected by Tenant and approved by Landlord, and the decision of such accountants shall be conclusive and binding upon the parties.  If such accountant decides that there was an error, Landlord will make correcting payment if Tenant overpaid such amount, and Tenant shall pay Landlord if Tenant underpaid such amount.  The fees and expenses involved in such decision shall be borne by the party required to pay for the audit.

(c)     All of the information obtained through Tenant's inspection with respect to financial matters (including, without limitation, costs, expenses and income) and any other matters pertaining to Landlord, the Leased Premises, the Building and/or the Park as well as any compromise, settlement or adjustment reached between Landlord and Tenant relative to the results of the inspection shall be held in strict confidence by Tenant and its officers, agents, and employees; and Tenant shall cause its independent professionals to be similarly bound.  The obligations within the preceding sentence shall survive the expiration or earlier termination of this Lease.

## ARTICLE 4 - SECURITY DEPOSIT

Section 4.01.  Security Deposit.  Within two (2) business days following Tenant's execution of this Lease, Tenant will deliver to Landlord an Irrevocable Letter of Credit (the "Letter of Credit") in the amount of the Security Deposit, in substantially the form attached hereto as **Exhibit E** and made a part hereof from a financial institution acceptable to Landlord, in its reasonable discretion.  Tenant shall cause the Letter of Credit to be maintained in full force and effect throughout the Lease Term and during

the sixty (60) day period after the later of (a) the expiration of the Lease Term or (b) the date that Tenant delivers possession of the Leased Premises to Landlord, as security for the performance by Tenant of all of Tenant's obligations contained in this Lease. In the event that, during the Lease Term, Tenant fails to deliver to Landlord a renewal or replacement to the Letter of Credit by a date no later than forty-five (45) days prior to its expiration date, Landlord shall have the right to demand and receive payment in full under the letter of credit and to hold the cash proceeds as the Security Deposit under this Lease. In the event of a Default by Tenant, Landlord may apply all or any part of the Security Deposit to cure all or any part of such Default; provided, however, that any such application by Landlord shall not be or be deemed to be an election of remedies by Landlord or considered or deemed to be liquidated damages. Tenant agrees to promptly deposit, upon demand, such additional sum with Landlord as may be required to maintain the full amount of the Security Deposit. All sums held by Landlord pursuant to this Article 4 shall be without interest and may be commingled by Landlord. Provided that Tenant has fully and faithfully performed all of the provisions of this Lease, Landlord shall return the Security Deposit to Tenant upon the expiration or earlier termination of this Lease.

Section 4.02. Reduction of Security Deposit. Commencing on each of the third (3rd) anniversary of the Commencement Date and the fourth (4th) anniversary of the Commencement Date, the portion of the Security Deposit represented by the Letter of Credit shall be reduced by Twenty-Six Thousand Six Hundred Thirty-One and No/100 Dollars ($26,631.00), provided that (a) the Letter of Credit is then in full force and effect (i.e. it has not been converted to cash), and (b) Tenant is not in Default hereunder and no facts or circumstances exist which with the giving of notice or the passage of time or both would constitute a default hereunder. Following each such reduction in the Security Deposit represented by the Letter of Credit, and provided the conditions set forth in clauses (a) and (b) above are satisfied, Landlord shall (at no cost to Landlord) (i) accept from the issuer of the Letter of Credit on each of the third (3rd) and fourth (4th) anniversaries of the Commencement Date an amendment to the Letter of Credit reducing the Letter of Credit by the sum of Twenty-Six Thousand Six Hundred Thirty-One and No/100 Dollars ($26,631.00), but which does not otherwise amend or modify the same, and (ii) execute and deliver to the issuer of the Letter of Credit such instruments as may be reasonably required by such issuer to effectuate such reduction.

## ARTICLE 5 - OCCUPANCY AND USE

Section 5.01. Use. Tenant shall use the Leased Premises for the Permitted Use and for no other purpose without the prior written consent of Landlord.

Section 5.02. Covenants of Tenant Regarding Use.

(a) Tenant shall (i) use and maintain the Leased Premises and conduct its business thereon in a safe, careful, reputable and lawful manner, (ii) comply, in all material respects, with that certain Declaration of Protective Covenants, Conditions, Restrictions, Reservations and Easements for Pembroke Pointe dated February 18, 2009, recorded March 11, 2009 in Book 46044, page 248, Broward County, Florida land records, as may be amended (collectively, the "Declaration") and all applicable laws, rules, regulations, orders, ordinances, directions and requirements of any governmental authority or agency, now in force or which may hereafter be in force (collectively, the "Laws"), including, without limitation, those Laws which shall impose upon Landlord or Tenant any duty with respect to or triggered by a change in the use or occupation of, or any improvement or alteration to, the Leased Premises, and (iii) comply with and obey all reasonable directions, rules and regulations of Landlord, including the Building rules and regulations attached hereto as Exhibit D and made a part hereof (the "Rules and Regulations"), as such Rules and Regulations may be modified from time to time by Landlord upon reasonable notice to

Tenant; provided, however, that such modifications shall not materially and adversely interfere with Tenant's use of the Leased Premises for the Permitted Use. Landlord acknowledges and agrees that such directions, rules and regulations of Landlord shall be uniformly enforced by Landlord. In the event of a conflict between the Rules and Regulations and the provisions of this Lease, the provisions of this Lease shall govern and control.

(b)     Tenant shall not do or permit anything to be done in or about the Leased Premises that will in any way cause a nuisance, obstruct or interfere with the rights of other tenants or occupants of the Building or injure or annoy them. Landlord shall not be responsible to Tenant for the non-performance by any other tenant or occupant of the Building of any of the Rules and Regulations, but Landlord agrees that any enforcement thereof shall be done uniformly. Tenant shall not use the Leased Premises, nor allow the Leased Premises to be used, for any purpose or in any manner that would (i) invalidate any policy of insurance now or hereafter carried by Landlord on the Building, or (ii) increase the rate of premiums payable on any such insurance policy unless Tenant reimburses Landlord for any such increase in premiums charged.

Section 5.03.  Landlord's Rights Regarding Use.  In addition to Landlord's rights specified elsewhere in this Lease, (a) Landlord shall have the right at any time, without notice to Tenant, to control, change or otherwise alter the Common Areas in such manner as it deems necessary or proper so long as any such control, change or alteration does not materially and adversely affect Tenant's use of the Leased Premises for the Permitted Use, and (b) Landlord, its agents, employees, representatives, consultants, contractors and any mortgagees of the Building, shall have the right (but not the obligation) to enter any part of the Leased Premises at reasonable times upon reasonable notice (except in the event of an emergency where no notice shall be required) and to enter upon the Building and Common Areas at any time without notice for the purposes of (i) examining or inspecting the same (including, without limitation, testing to confirm Tenant's compliance with this Lease), (ii) showing the same to prospective purchasers or mortgagees, (iii) during the last one hundred eighty (180) days of the Lease Term and any time Tenant is in Default hereunder, showing the same to prospective tenants, and (iv) making such repairs, alterations or improvements to the Leased Premises or the Building as Landlord may deem necessary or desirable. Except to the extent of Landlord's negligence or willful misconduct not otherwise waived by Tenant pursuant to Section 8.06 below or any other provision of this Lease, Landlord shall incur no liability to Tenant for such entry, nor shall such entry constitute an eviction of Tenant or a termination of this Lease, or entitle Tenant to any abatement of rent therefor. Without limiting the foregoing, Landlord covenants and agrees that in exercising any of its rights under this Section 5.03, Landlord shall use reasonable efforts to minimize any interference with Tenant's use of the Leased Premises for the Permitted Use.

Section 5.04.  Signage.  Landlord, at its cost and expense, shall provide Tenant with Building standard signage on the main Building directory and at the entrance to the Leased Premises. Any changes requested by Tenant to the initial directory or suite signage shall be made at Tenant's sole cost and expense and shall be subject to Landlord's approval. In addition to the foregoing, Tenant shall have the right, at Tenant's sole cost and expense, to install a placard displaying Tenant's name and/or logo on the monument sign serving the Building (the "Sign"); provided that said Sign and Tenant's installation thereof complies with all laws, rules, regulations and ordinances encumbering the Building. Without limiting the foregoing, Tenant specifically acknowledges and agrees that Tenant shall be solely responsible for ensuring that the Sign complies with the Declaration as of the Commencement Date, and that any failure by Tenant to comply with the terms of the Declaration (including, without limitation, obtaining any approvals therein required) shall be at Tenant's sole risk and expense. Landlord shall use reasonable efforts, at no cost to Landlord, to assist Tenant in obtaining the necessary approvals from the Design Review

Committee for the Sign. The size, location, materials, coloring, lettering, lighting and method of installation shall be subject to Landlord's prior approval. Tenant shall, at its sole cost and expense, keep and maintain the Sign in good condition and repair. Within ten (10) days following the expiration or earlier termination of this Lease, Tenant shall be responsible for removing the Sign and repairing any damage caused by its removal. Landlord may install such other signs, advertisements, notices or tenant identification information on the Building directory, tenant access doors or other areas of the Building, as it shall deem necessary or proper. Tenant shall not place any exterior signs on the Leased Premises or interior signs visible from the exterior of the Leased Premises without the prior written consent of Landlord. Notwithstanding any other provision of this Lease to the contrary, Landlord may, upon two (2) days prior notice, remove any sign(s) placed by Tenant in violation of this <u>Section 5.04</u>.

   <u>Section 5.05</u>.  <u>Parking</u>.  Throughout the Lease Term and any extensions thereof, Landlord shall make available to Tenant a number of automobile parking spaces (on an unassigned, non-exclusive basis) in the parking area of the Park based on a formula of five (5) parking spaces for each 1,000 square feet of rentable area within the Leased Premises, rounded to the nearest whole number of spaces. Such parking shall be at no additional cost to Tenant. Tenant agrees not to overburden the parking facilities and agrees to cooperate with Landlord and other tenants in the use of the parking facilities. Landlord reserves the right in its absolute discretion to determine whether parking facilities are becoming crowded and, in such event, to allocate parking spaces among Tenant and other tenants. There will be no assigned parking unless Landlord, in its sole discretion, deems such assigned parking advisable. No vehicle may be repaired or serviced in the parking area and any vehicle brought into the parking area by Tenant, or any of Tenant's employees, agents, representatives, contractors, customers, guests or invitees, and deemed abandoned by Landlord will be towed and all costs thereof shall be borne by the Tenant. All driveways, ingress and egress, and all parking spaces are for the joint use of all tenants. There shall be no parking permitted on any of the streets or roadways located within the Park. In addition, Tenant agrees that its employees will not park in the spaces designated visitor parking.

## <u>ARTICLE 6 - UTILITIES AND OTHER BUILDING SERVICES</u>

   <u>Section 6.01</u>.  <u>Services to be Provided</u>.  Provided Tenant is not in default beyond applicable notice and cure periods, Landlord shall furnish to Tenant, except as noted below, the following utilities and other services:

   (a)  HVAC service between the hours of 8:00 a.m. and 6:00 p.m. Monday through Friday and, upon Tenant's prior written request, 9:00 a.m. to 1:00 p.m. on Saturday of each week except on legal holidays;

   (b)  Electrical service;

   (c)  Water in the Common Areas for lavatory and drinking purposes;

   (d)  Sewer service;

   (e)  Automatic elevator service;

   (f)  Cleaning and janitorial service in the Leased Premises and Common Areas on Monday through Friday of each week except legal holidays; provided, however, Tenant shall be responsible for carpet cleaning other than routine vacuuming;

(g)      Washing of windows at intervals reasonably established by Landlord;

(h)      Replacement of all lamps, bulbs, starters and ballasts in Building standard lighting as required from time to time as a result of normal usage; and

(i)      Maintenance of the Common Areas, including the removal of rubbish.

Section 6.02.  Additional Services.

(a)      If Tenant requests utilities or building services in addition to those identified above, or if Tenant uses any of the above utilities or services in frequency, scope, quality or quantity substantially greater than that which Landlord determines, in its commercially reasonable discretion. is normally required by other tenants in the Building or by tenants in comparable office buildings, then Landlord shall use reasonable efforts to attempt to furnish Tenant with such additional utilities or services.  In the event Landlord is able to and does furnish such additional utilities or services, (i) the costs thereof (which shall be deemed to mean the cost that Tenant would have incurred had Tenant contracted directly with the utility company or service provider) shall be borne by Tenant, who shall reimburse Landlord monthly for the same as Additional Rent, and (ii) Landlord shall also have the right to submeter or separately meter the Leased Premises (or portion thereof) at Tenant's sole cost, and Tenant shall pay such utilities based on the submeter or separate meter.

(b)      If any lights, density of staff, machines or equipment used by Tenant in the Leased Premises materially affect the temperature otherwise maintained by the Building's air-conditioning system or generate substantially more heat in the Leased Premises than that which would normally be generated by other tenants in the Building or by tenants in comparable office buildings, then Landlord shall have the right to install any machinery or equipment that Landlord considers reasonably necessary in order to restore the temperature balance between the Leased Premises and the rest of the Building, including, without limitation, equipment that modifies the Building's HVAC system.  All costs expended by Landlord to install any such machinery and equipment and any additional costs of operation and maintenance in connection therewith shall be borne by Tenant, who shall reimburse Landlord for the same as provided in this Section 6.02.

Section 6.03.  Interruption of Services.  Tenant acknowledges and agrees that any one or more of the utilities or other services identified in Sections 6.01 or 6.02 or otherwise hereunder may be interrupted by reason of accident, emergency or other causes beyond Landlord's control, or may be discontinued or diminished temporarily by Landlord or other persons until certain repairs, alterations or improvements can be made.  Landlord shall not be liable in damages or otherwise for any failure or interruption of any utility or service and no such failure or interruption shall entitle Tenant to terminate this Lease or withhold sums due hereunder.  Notwithstanding the foregoing, in the event that (a) an interruption of utility service to the Leased Premises is due to Landlord's negligence or intentional wrongful acts, (b) the restoration of such utility service is entirely within Landlord's control, and (c) such interruption renders all or a portion of the Leased Premises untenantable (meaning that Tenant is unable to use, and does not use, such space in the normal course of its business for the Permitted Use) for more than five (5) consecutive business days, then Minimum Annual Rent shall abate proportionately with respect to the portion of the Leased Premises rendered untenantable on a per diem basis for each day after such five (5) business-day period during which such portion of the Leased Premises remains untenantable.  Such abatement shall be Tenant's sole remedy for Landlord's failure to restore service as set forth above, and Tenant shall not be entitled to damages (consequential or otherwise) as a result thereof.

## ARTICLE 7 - REPAIRS, MAINTENANCE AND ALTERATIONS

Section 7.01. Repair and Maintenance of Building. Landlord shall make all necessary repairs and replacements to the roof, exterior walls, exterior doors, windows, corridors and other Common Areas, and Landlord shall keep the Building in a clean and neat condition and use reasonable efforts to keep all equipment used in common with other tenants in good condition and repair. The cost of such repairs, replacements and maintenance shall be included in Operating Expenses to the extent provided in Section 3.02; provided however, subject to the provisions of Section 8.06 below, to the extent any such repairs, replacements or maintenance are required because of the negligence, misuse or default of Tenant, its employees, agents, contractors, customers or invitees, Landlord shall make such repairs at Tenant's sole expense.

Section 7.02. Repair and Maintenance of Leased Premises. Landlord shall keep and maintain the Leased Premises in good condition and repair. The cost of such repairs and maintenance to the Leased Premises shall be included in Operating Expenses. Notwithstanding the above, Tenant shall be solely responsible for any repair or replacement with respect to Tenant's Property (as defined in Section 8.01 below) located in the Leased Premises, the Building or the Common Areas. Nothing in this Article 7 shall obligate Landlord or Tenant to repair normal wear and tear to any paint, wall covering or carpet in the Leased Premises.

Section 7.03. Alterations. Tenant shall not permit alterations in or to the Leased Premises unless and until Landlord has approved the plans therefor in writing. As a condition of such approval, Landlord may require Tenant to remove the alterations and restore the Leased Premises to its pre-alterations condition upon termination of this Lease; otherwise, all such alterations shall, at Landlord's option, become a part of the realty and the property of Landlord and shall not be removed by Tenant. Tenant shall ensure that all alterations shall be made in accordance with all applicable Laws, in a good and workmanlike manner and of quality at least equal to the original construction of the Building. No person shall be entitled to any lien derived through or under Tenant for any labor or material furnished to the Leased Premises, and nothing in this Lease shall be construed to constitute Landlord's consent to the creation of any lien. If any lien is filed against the Leased Premises for work claimed to have been done for or material claimed to have been furnished to Tenant, Tenant shall cause such lien to be discharged of record or bonded over within thirty (30) days after filing. Tenant shall indemnify Landlord from all costs, losses, expenses and reasonable attorneys' fees in connection with any construction or alteration and any related lien. Tenant agrees that at Landlord's option, Landlord or a subsidiary or affiliate of Landlord, who shall receive a fee as Landlord's construction manager or general contractor, shall perform all work on any alterations to the Leased Premises.

## ARTICLE 8 - INDEMNITY AND INSURANCE

Section 8.01. Release. All of Tenant's trade fixtures, merchandise, inventory, special fire protection equipment, telecommunication and computer equipment, supplemental air conditioning equipment, kitchen equipment and other personal property located in or about the Leased Premises, the Building or the Common Areas, which is deemed to include the trade fixtures, merchandise, inventory and personal property of others located in or about the Leased Premises or Common Areas at the invitation, direction or acquiescence (express or implied) of Tenant (all of which property shall be referred to herein, collectively, as "Tenant's Property"), shall be and remain at Tenant's sole risk. Landlord shall not be liable to Tenant or to any other person for, and Tenant hereby releases Landlord (and its affiliates, property managers and mortgagees) from (a) any and all liability for theft of or damage

to Tenant's Property, and (b) any and all liability for any injury to Tenant or its employees, agents, representatives, contractors, customers, guests and invitees in or about the Leased Premises, the Building, the Common Areas or the Park, except to the extent caused directly by the negligence or willful misconduct of Landlord, its agents, employees or contractors.  Nothing contained in this Section 8.01 shall limit (or be deemed to limit) the waivers contained in Section 8.06 below.  In the event of any conflict between the provisions of Section 8.06 below and this Section 8.01, the provisions of Section 8.06 shall prevail.  This Section 8.01 shall survive the expiration or earlier termination of this Lease.

Section 8.02.  Indemnification by Tenant.  Tenant shall protect, defend, indemnify and hold harmless Landlord, its agents, employees and contractors of all tiers from and against any and all claims, damages, demands, penalties, costs, liabilities, losses, and expenses (including reasonable attorneys' fees and expenses at the trial and appellate levels) to the extent (a) caused directly by the negligence or willful misconduct of Tenant or Tenant's agents, employees, contractors, customers or invitees in or about the Leased Premises, the Building, the Common Areas or the Park, (b) arising out of or relating to any of Tenant's Property, or (c) arising out of any other act or occurrence within the Leased Premises, in all such cases except to the extent caused directly by the negligence or willful misconduct of Landlord, its agents, employees or contractors.  Nothing contained in this Section 8.02 shall limit (or be deemed to limit) the waivers contained in Section 8.06 below.  In the event of any conflict between the provisions of Section 8.06 below and this Section 8.02, the provisions of Section 8.06 shall prevail.  This Section 8.02 shall survive the expiration or earlier termination of this Lease.

Section 8.03.  Indemnification by Landlord.  Landlord shall protect, defend, indemnify and hold harmless Tenant, its agents, employees and contractors of all tiers from and against any and all claims, damages, demands, penalties, costs, liabilities, losses and expenses (including reasonable attorneys' fees and expenses at the trial and appellate levels) to the extent caused directly by the negligence or willful misconduct of Landlord or Landlord's agents, representatives, guests, employees or contractors.  Nothing contained in this Section 8.03 shall limit (or be deemed to limit) the waivers contained in Section 8.06 below.  In the event of any conflict between the provisions of Section 8.06 below and this Section 8.03, the provisions of Section 8.06 shall prevail.  This Section 8.03 shall survive the expiration or earlier termination of this Lease.

Section 8.04.  Tenant's Insurance.

(a)     During the Lease Term (and any period of early entry or occupancy or holding over by Tenant, if applicable), Tenant shall maintain the following types of insurance, in the amounts specified below:

(i)     Liability Insurance.  Commercial General Liability Insurance, ISO Form CG 00 01, or its equivalent, covering Tenant's use of or occupancy at the Leased Premises against claims for bodily injury or death or property damage, which insurance shall be primary and non-contributory and shall provide coverage on an occurrence basis with a per occurrence limit of not less than $2,000,000 for each policy year, which limit may be satisfied by any combination of primary and excess or umbrella per occurrence policies.

(ii)     Property Insurance.  Special Form Insurance in the amount of the full replacement cost of Tenant's Property (including, without limitation, alterations or additions performed by Tenant pursuant hereto, but excluding those improvements, if any, made pursuant to Section 2.02 above), which insurance shall waive coinsurance limitations.

(iii)    Workers' Compensation Insurance.  Workers' Compensation insurance in amounts required by applicable Laws; provided, if there is no statutory requirement for Tenant, Tenant shall still obtain Worker's Compensation insurance coverage.

(iv)    Business Interruption Insurance.  Business Interruption Insurance with limits not less than an amount equal to two (2) years rent hereunder.

(v)    Automobile Insurance.  Commercial Automobile Liability Insurance insuring bodily injury and property damage arising from all owned, non-owned and hired vehicles, if any, with minimum limits of liability of $1,000,000 combined single limit, per accident.

(b)    All insurance required to be carried by Tenant hereunder shall (i) be issued by one or more insurance companies reasonably acceptable to Landlord, licensed to do business in the State in which the Leased Premises is located and having an AM Best's rating of A IX or better, and (ii) provide that said insurer shall endeavor to provide thirty (30) days prior notice if coverage is materially changed, canceled or permitted to lapse.  In addition, Tenant shall name Landlord, Landlord's managing agent, and any mortgagee requested by Landlord, as additional insureds under Tenant's Commercial General Liability Insurance, excess and umbrella policies (but only to the extent of the limits required hereunder). On or before the Commencement Date (or the date of any earlier entry or occupancy by Tenant), and thereafter, prior to the expiration of each such policy, Tenant shall furnish Landlord with certificates of insurance in the form of ACORD 25 (or other evidence of insurance reasonably acceptable to Landlord), evidencing all required coverages, and that with the exception of Workers' Compensation insurance, such insurance is primary and non-contributory.  Upon Tenant's receipt of a request from Landlord, Tenant shall provide Landlord with copies of all insurance policies, including all endorsements, evidencing the coverages required hereunder.  If Tenant fails to carry such insurance and furnish Landlord with such certificates of insurance or copies of insurance policies (if applicable), Landlord may obtain such insurance on Tenant's behalf and Tenant shall reimburse Landlord upon demand for the cost thereof as Additional Rent.  Landlord reserves the right from time to time to require Tenant to obtain higher minimum amounts or different types of insurance if it becomes customary for other landlords of similar buildings in the area to require similar sized tenants in similar industries to carry insurance of such higher minimum amounts or of such different types.

Section 8.05.  Landlord's Insurance.  During the Lease Term, Landlord shall maintain the following types of insurance, in the amounts specified below (the cost of which shall be included in Operating Expenses):

(a)    Liability Insurance.  Commercial General Liability Insurance, ISO Form CG 00 01, or its equivalent, covering the Common Areas against claims for bodily injury or death and property damage, which insurance shall provide coverage on an occurrence basis with a per occurrence limit of not less than $2,000,000 for each policy year, which limit may be satisfied by any combination of primary and excess or umbrella per occurrence policies.

(b)    Property Insurance.  Special Form Insurance in the amount of the full replacement cost of the Building, including, without limitation, any improvements, if any, made pursuant to Section 2.02 above, but excluding Tenant's Property and any other items required to be insured by Tenant pursuant to Section 8.04 above.

Section 8.06.  Waiver of Subrogation.  Notwithstanding anything contained in this Lease to the contrary, each of Landlord (and its affiliates, property managers and mortgagees) and Tenant (and its

affiliates) hereby waives any and all rights of recovery, claims, actions or causes of action against the other party, or such other party's employees, agents or contractors, for any loss or damage to the Leased Premises, the Building, the Common Areas and to any personal property of such party, arising from any risk which is required to be insured against by <u>Sections 8.04(a)(ii)</u>, <u>8.04(a)(iii)</u>, and <u>8.05(b)</u> above. The effect of such waiver is not limited by the amount of such insurance actually carried or required to be carried, or to the actual proceeds received after a loss or to any deductible applicable thereto, and either party's failure to carry insurance required under this Lease shall not invalidate such waiver. The foregoing waiver shall apply regardless of the cause or origin of any such claim, including, without limitation, the fault or negligence of either party or such party's employees, agents or contractors. The Special Form Insurance policies and Workers' Compensation Insurance policies maintained by Landlord and Tenant as provided in this Lease shall include an express waiver of any rights of subrogation by the insurance company against Landlord or Tenant, as applicable.

## ARTICLE 9 - CASUALTY

In the event of total or partial destruction of the Building or the Leased Premises by fire or other casualty, Landlord agrees promptly to restore and repair same; provided, however, Landlord's obligation hereunder with respect to the Leased Premises shall be limited to the reconstruction of such of the leasehold improvements as were originally required to be made by Landlord pursuant to <u>Section 2.02</u> above, if any. Rent shall proportionately abate during the time that the Leased Premises or part thereof are unusable because of any such damage. Notwithstanding the foregoing, if the Leased Premises are (a) destroyed to the extent that they cannot be repaired or rebuilt within two hundred ten (210) days from the casualty date; or (b) destroyed by a casualty that is not covered by the insurance required hereunder or, if covered, such insurance proceeds are not released by any mortgagee entitled thereto or are insufficient to rebuild the Building and the Leased Premises; then, in the case of a clause (a) casualty, either Landlord or Tenant may, or, in the case of a clause (b) casualty, then Landlord may, upon thirty (30) days' written notice to the other party, terminate this Lease with respect to matters thereafter accruing. Tenant hereby waives any rights under applicable Laws inconsistent with the terms of this <u>Article 9</u>.

## ARTICLE 10 - EMINENT DOMAIN

If all or any substantial part of the Building or Common Areas shall be acquired by the exercise of eminent domain, Landlord may terminate this Lease by giving written notice to Tenant on or before the date possession thereof is so taken. If all or any part of the Leased Premises shall be acquired by the exercise of eminent domain so that the Leased Premises shall become impractical for Tenant to use for the Permitted Use, Tenant may terminate this Lease by giving written notice to Landlord as of the date possession thereof is so taken. All damages awarded shall belong to Landlord; provided, however, that Tenant may claim an award for relocation expenses but only if such amount is not subtracted from Landlord's award and does not otherwise diminish or adversely affect any award to Landlord.

## ARTICLE 11 - ASSIGNMENT AND SUBLEASE

<u>Section 11.01</u>. <u>Assignment and Sublease</u>.

(a)      Tenant shall not assign this Lease or sublet the Leased Premises in whole or in part without Landlord's prior written consent. In the event of any permitted assignment or subletting, Tenant shall remain primarily liable hereunder. The acceptance of rent by Landlord from any other person or entity shall not be deemed to be a waiver of any of the provisions of this Lease or to be a consent to the assignment of this Lease or the subletting of the Leased Premises. Any assignment or sublease consented

to by Landlord shall not relieve Tenant (or its assignee) from obtaining Landlord's consent to any subsequent assignment or sublease hereunder.

(b)       By way of example and not limitation, Landlord shall be deemed to have reasonably withheld consent to a proposed assignment or sublease if in Landlord's opinion (i) the Leased Premises are or may be in any way adversely affected; (ii) the business reputation of the proposed assignee or subtenant is unacceptable; (iii) the financial worth of the proposed assignee or subtenant is insufficient to meet the obligations of Tenant hereunder, or (iv) the prospective assignee or subtenant is a current tenant at the Park or is a bona-fide third-party prospective tenant of Landlord at the Park.  Landlord further expressly reserves the right to refuse to give its consent to any subletting if the proposed rent is publicly advertised to be less than the rent publicly advertised for similar premises in the Building.  If Landlord refuses to give its consent to any proposed assignment or subletting, Landlord may, at its option, within thirty (30) days after receiving a request to consent, terminate this Lease by giving Tenant thirty (30) days prior written notice of such termination, whereupon each party shall be released from all further obligations and liability hereunder, except those which expressly survive the termination of this Lease.

(c)       If Tenant shall make any assignment or sublease, with Landlord's consent, for a rental in excess of the rent payable under this Lease, Tenant shall pay to Landlord all of such excess rental upon receipt.  Tenant agrees to pay Landlord $500.00 upon demand by Landlord for reasonable accounting and attorneys' fees incurred in conjunction with the processing and documentation of any requested assignment, subletting or any other hypothecation of this Lease or Tenant's interest in and to the Leased Premises as consideration for Landlord's consent.

Section 11.02.  Permitted Transfer.  Notwithstanding anything to the contrary contained in Section 11.01 above, Tenant shall have the right, without Landlord's consent, but upon ten (10) days prior notice to Landlord, to (a) sublet all or part of the Leased Premises to any related corporation or other entity which controls Tenant, is controlled by Tenant or is under common control with Tenant; (b) assign this Lease to any related corporation or other entity which controls Tenant, is controlled by Tenant, or is under common control with Tenant, or to a successor entity into which or with which Tenant is merged or consolidated or which acquires substantially all of Tenant's assets or property; or (c) effectuate any public offering of Tenant's stock on the New York Stock Exchange or in the NASDAQ over the counter market, provided that in the event of a transfer pursuant to clause (b), the tangible net worth of the successor entity after any such transaction is not less than the tangible net worth of Tenant as of the date hereof and provided further that such successor entity assumes all of the obligations and liabilities of Tenant (any such entity hereinafter referred to as a "Permitted Transferee").  For the purpose of this Article 11 (i) "control" shall mean ownership of not less than fifty percent (50%) of all voting stock or legal and equitable interest in such corporation or entity, and (ii) "tangible net worth" shall mean the excess of the value of tangible assets (i.e. assets excluding those which are intangible such as goodwill, patents and trademarks) over liabilities.  Any such transfer shall not relieve Tenant of its obligations under this Lease.  Nothing in this Section 11.02 is intended to nor shall permit Tenant to transfer its interest under this Lease as part of a fraud or subterfuge to intentionally avoid its obligations under this Lease (for example, transferring its interest to a shell corporation that subsequently files a bankruptcy), and any such transfer shall constitute a Default hereunder.  Any change in control of Tenant resulting from a merger, consolidation, or a transfer of partnership or membership interests, a stock transfer, or any sale of substantially all of the assets of Tenant that do not meet the requirements of this Section 11.02 shall be deemed an assignment or transfer that requires Landlord's prior written consent pursuant to Section 11.01 above.

## ARTICLE 12 - TRANSFERS BY LANDLORD

Section 12.01.  Sale of the Building.  Landlord shall have the right to sell the Building and Common Areas at any time during the Lease Term, subject only to the rights of Tenant hereunder; and such sale shall operate to release Landlord from liability accruing hereunder after the date of such conveyance.

Section 12.02.  Estoppel Certificate.  Within ten (10) days following receipt of a written request from Landlord, Tenant shall execute and deliver to Landlord, without cost to Landlord, an estoppel certificate in such form as Landlord may reasonably request certifying (a) that this Lease is in full force and effect and unmodified or stating the nature of any modification, (b) the date to which rent has been paid, (c) that there are not, to Tenant's knowledge, any uncured defaults or specifying such defaults if any are claimed, and (d) any other matters or state of facts reasonably required respecting this Lease.  Such estoppel may be relied upon by Landlord and by any purchaser or mortgagee of the Building.

Section 12.03.  Subordination.  This Lease is and shall be expressly subject and subordinate at all times to the lien of any present or future mortgage or deed of trust encumbering fee title to the Leased Premises.  If any such mortgage or deed of trust be foreclosed, upon request of the mortgagee or beneficiary, as the case may be, Tenant will attorn to the purchaser at the foreclosure sale.  The foregoing provisions are declared to be self-operative and no further instruments shall be required to effect such subordination and/or attornment; provided, however, that subordination of this Lease to any present or future mortgage or trust deed shall be conditioned upon the mortgagee, beneficiary, or purchaser at foreclosure, as the case may be, agreeing that Tenant's occupancy of the Leased Premises and other rights under this Lease shall not be disturbed by reason of the foreclosure of such mortgage or trust deed, as the case may be, so long as Tenant is not in default beyond the applicable notice and cure period under this Lease.  Within ten (10) days following receipt of a written request from Landlord, Tenant shall execute and deliver to Landlord, without cost, such commercially reasonable instrument that Landlord deems necessary or desirable to confirm the subordination of this Lease.

## ARTICLE 13 - DEFAULT AND REMEDY

Section 13.01.  Default.  The occurrence of any of the following shall be a "Default":

(a)     Tenant fails to pay any Monthly Rental Installments or Additional Rent (i) within five (5) days following written notice from Landlord on the first occasion in any twelve (12) month period, or (ii) within five (5) days after the same is due on any subsequent occasion within said twelve (12) month period.  Tenant hereby expressly waives any additional notice required under §83.20 of the Florida Statutes.

(b)     Tenant fails to perform or observe any other term, condition, covenant or obligation required under this Lease (other than those governed by subsections (c) through (e) below) for a period of thirty (30) days after written notice thereof from Landlord; provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required to cure, then such default shall be deemed to have been cured if Tenant commences such performance within said thirty (30) day period and thereafter diligently completes the required action within a reasonable time.

(c)     Tenant shall permanently abandon or vacate the Leased Premises, or fail to occupy the Leased Premises or any substantial portion thereof for a period of sixty (60) consecutive days.

(d)      Tenant shall assign or sublet all or a portion of the Leased Premises in violation of the provisions of <u>Article 11</u> of this Lease.

(e)      All or substantially all of Tenant's assets in the Leased Premises or Tenant's interest in this Lease are attached or levied under execution (and Tenant does not discharge the same within sixty (60) days thereafter); a petition in bankruptcy, insolvency or for reorganization or arrangement is filed by or against Tenant (and Tenant fails to secure a stay or discharge thereof within sixty (60) days thereafter); Tenant is insolvent and unable to pay its debts as they become due; Tenant makes a general assignment for the benefit of creditors; Tenant takes the benefit of any insolvency action or law; the appointment of a receiver or trustee in bankruptcy for Tenant or its assets if such receivership has not been vacated or set aside within thirty (30) days thereafter; or, dissolution or other termination of Tenant's corporate charter if Tenant is a corporation.

(f)      The parties agree that if Tenant receives written notice of a violation of the performance of the same term or condition of this Lease three (3) or more times during any twelve (12) month period, regardless of whether such violations are ultimately cured, then such conduct shall, at Landlord's option, represent a separate Default.

<u>Section 13.02</u>.  <u>Remedies</u>.  Upon the occurrence of any Default, Landlord shall have the following rights and remedies, in addition to those stated elsewhere in this Lease and those allowed by law or in equity, any one or more of which may be exercised without further notice to Tenant:

(a)      Landlord may re-enter the Leased Premises and cure any such Default of Tenant, and Tenant shall, immediately upon demand, reimburse Landlord, as Additional Rent, for any costs and expenses that Landlord thereby incurs; and Landlord shall not be liable to Tenant for any loss or damage that Tenant may sustain by reason of Landlord's action.

(b)      Landlord may terminate this Lease by giving Tenant notice of termination, in which event this Lease shall expire and terminate on the date specified in such notice of termination and all rights of Tenant under this Lease and in and to the Leased Premises shall terminate, except with respect to any provisions thereunder that expressly survive such termination.  Tenant shall remain liable for all obligations under this Lease arising up to the date of such termination, and Tenant shall surrender the Leased Premises to Landlord on the date specified in such notice.  Furthermore, in the event that Landlord terminates this Lease, Tenant shall be liable to Landlord for the unamortized balance (calculated on a straight line basis) of any leasehold improvement allowance and brokerage fees paid in connection with this Lease.

(c)      Without terminating this Lease, Landlord may terminate Tenant's right to possession of the Leased Premises, pursuant to  the laws of the State in which the Building is located, and thereafter, neither Tenant nor any person claiming under or through Tenant shall be entitled to possession of the Leased Premises.  In such event, Tenant shall immediately surrender the Leased Premises to Landlord, and Landlord may re-enter the Leased Premises and dispossess Tenant and any other occupants of the Leased Premises by any lawful means and may remove their effects, without prejudice to any other remedy that Landlord may have.  Upon termination of possession, Landlord may re-let all or any part thereof as the agent of Tenant for a term different from that which would otherwise have constituted the balance of the Lease Term and for rent and on terms and conditions different from those contained herein, whereupon Tenant shall be immediately obligated to pay to Landlord an amount equal to (i) the difference between the rent provided for herein and that provided for in any lease covering a subsequent re-letting of the Leased Premises, for the period which would otherwise have constituted the balance of

the Lease Term had this Lease not been terminated (said period being referred to herein as the "Remaining Term"), (ii) the costs of recovering possession of the Leased Premises and all other expenses, loss or damage incurred by Landlord by reason of Tenant's Default ("Default Damages"), which shall include, without limitation, expenses of preparing the Leased Premises for re-letting, demolition, repairs, tenant finish improvements, brokers' commissions and reasonable attorneys' fees, and (iii) all unpaid Minimum Annual Rent and Additional Rent that accrued prior to the date of termination of possession, plus any interest and late fees due hereunder (the "Prior Obligations"). Neither the filing of any dispossessory proceeding nor an eviction of personalty in the Leased Premises shall be deemed to terminate this Lease.

(d)     Landlord may terminate this Lease and recover from Tenant all damages Landlord may incur by reason of Tenant's default, including, without limitation, an amount which, at the date of such termination is equal to the sum of the following: (i) the present value of the excess, if any, discounted at the Prime Rate, of (A) the Minimum Annual Rent, Additional Rent and all other sums that would have been payable hereunder by Tenant for the Remaining Term, less (B) the aggregate reasonable rental value of the Leased Premises for the Remaining Term, as determined by a commercial real estate broker licensed in the State of Florida who has at least ten (10) years of experience in office leasing, (ii) all of the Default Damages, and (iii) all Prior Obligations. Landlord and Tenant acknowledge and agree that the payment of the amount set forth in clause (i) above shall not be deemed a penalty, but shall merely constitute payment of liquidated damages, it being understood that actual damages to Landlord are extremely difficult, if not impossible, to ascertain. It is expressly agreed and understood that all of Tenant's liabilities and obligations set forth in this subsection (d) shall survive termination of this Lease.

(e)     With or without terminating this Lease, declare immediately due and payable the sum of the following: (i) the present value (discounted at the Prime Rate) of all Minimum Annual Rent and Additional Rent due and coming due under this Lease for the entire Remaining Term (as if by the terms of this Lease they were payable in advance), (ii) all Default Damages, and (iii) all Prior Obligations, whereupon Tenant shall be obligated to pay the same to Landlord; provided, however, that such payment shall not be deemed a penalty or liquidated damages, but shall merely constitute payment in advance of all Minimum Annual Rent and Additional Rent payable hereunder throughout the Remaining Term, and provided further, however, that upon Landlord receiving such payment, Tenant shall be entitled to receive from Landlord all rents received by Landlord from other assignees, tenant and subtenants on account of said Leased Premises during the Remaining Term (but only to the extent that the monies to which Tenant shall so become entitled do not exceed the entire amount actually paid by Tenant to Landlord pursuant to this subsection (e)), less all Default Damages of Landlord incurred but not yet reimbursed by Tenant.

(f)     Landlord may sue for injunctive relief or to recover damages for any loss resulting from the Default.

Section 13.03. Landlord's Default and Tenant's Remedies. Landlord shall be in default if it fails to perform any term, condition, covenant or obligation required under this Lease for a period of thirty (30) days after written notice thereof from Tenant to Landlord; provided, however, that if the term, condition, covenant or obligation to be performed by Landlord is such that it cannot reasonably be performed within thirty (30) days, such default shall be deemed to have been cured if Landlord commences such performance within said thirty-day period and thereafter diligently undertakes to complete the same. Upon the occurrence of any such default by Landlord, Tenant may sue for injunctive relief or to recover damages for any loss directly resulting from such default, but Tenant shall not be

entitled to terminate this Lease or withhold, offset or abate any sums due hereunder. In no event, however, shall Landlord be liable to Tenant for any consequential or punitive damages.

Section 13.04. <u>Limitation of Landlord's Liability</u>. If Landlord shall fail to perform any term, condition, covenant or obligation required to be performed by it under this Lease, and if Tenant shall, as a consequence thereof, recover a money judgment against Landlord, Tenant agrees that it shall look solely to Landlord's right, title and interest in and to the Building including any net proceeds of the sale or refinancing (after paying off any encumbrances), and any insurance proceeds or condemnation awards not applied to the reconstruction or restoration of the Building or the Leased Premises for the collection of such judgment; and Tenant further agrees that no other assets of Landlord shall be subject to levy, execution or other process for the satisfaction of Tenant's judgment.

Section 13.05. <u>Nonwaiver of Defaults</u>. Neither party's failure nor delay in exercising any of its rights or remedies or other provisions of this Lease shall constitute a waiver thereof or affect its right thereafter to exercise or enforce such right or remedy or other provision at that time or in the future. No waiver of any default shall be deemed to be a waiver of any other default. Landlord's receipt of less than the full rent due shall not be construed to be other than a payment on account of rent then due, nor shall any statement on Tenant's check or any letter accompanying Tenant's check be deemed an accord and satisfaction, and Landlord may accept such payment without prejudice to Landlord's right to recover the balance due or to pursue any other remedy available to Landlord. No act or omission by Landlord or its employees or agents during the Lease Term shall be deemed an acceptance of a surrender of the Leased Premises, and no agreement to accept such a surrender shall be valid unless in writing and signed by Landlord.

Section 13.06. <u>Attorneys' Fees</u>. If either party defaults in the performance or observance of any of the terms, conditions, covenants or obligations contained in this Lease and the non-defaulting party obtains a judgment against the defaulting party, then the defaulting party agrees to reimburse the non-defaulting party for reasonable attorneys' fees incurred in connection therewith. In addition, if a monetary Default shall occur and Landlord engages outside counsel to exercise its remedies hereunder, and then Tenant cures such monetary Default, Tenant shall pay to Landlord, on demand, all expenses incurred by Landlord as a result thereof, including reasonable attorneys' fees, court costs and expenses actually incurred.

## ARTICLE 14 - LANDLORD'S RIGHT TO RELOCATE TENANT

### INTENTIONALLY OMITTED.

## ARTICLE 15 - TENANT'S RESPONSIBILITY REGARDING ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES

Section 15.01. <u>Environmental Definitions</u>.

(a)      "Environmental Laws" shall mean all present or future federal, state and municipal laws, ordinances, rules and regulations applicable to the environmental and ecological condition of the Leased Premises, the Building and the Common Areas, and the rules and regulations of the Federal Environmental Protection Agency and any other federal, state or municipal agency or governmental board or entity having jurisdiction over the Leased Premises, the Building and the Common Areas.

(b)     "Hazardous Substances" shall mean petroleum products and those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances" "solid waste" or "infectious waste" under Environmental Laws.

Section 15.02.  Restrictions on Tenant.  Tenant shall not cause or permit the use, generation, release, manufacture, refining, production, processing, storage or disposal of any Hazardous Substances on, under or about the Leased Premises, the Building, the Common Areas or the Park, or the transportation to or from the Leased Premises of any Hazardous Substances, except as necessary and appropriate for its Permitted Use in which case the use, storage or off-site disposal of such Hazardous Substances shall be performed in compliance with the Environmental Laws and the highest standards prevailing in the industry.

Section 15.03.  Notices, Affidavits, Etc.  Tenant shall immediately (a) notify Landlord of (i) any violation by Tenant, its employees, agents, representatives, guests, customers, invitees or contractors of any Environmental Laws on, under or about the Leased Premises, the Building, the Common Areas or the Park, or (ii) the presence or suspected presence of any Hazardous Substances on, under or about the Leased Premises, and (b) deliver to Landlord any notice received by Tenant relating to (a)(i) and (a)(ii) above from any source.  Tenant shall execute affidavits, representations and the like within five (5) days of Landlord's request therefor concerning Tenant's best knowledge and belief regarding the presence of any Hazardous Substances on, under or about the Leased Premises.

Section 15.04.  Tenant's Indemnification.  Tenant shall indemnify, defend and hold harmless Landlord and Landlord's managing agent from and against any and all claims, losses, liabilities, costs, expenses, penalties and damages, including reasonable attorneys' fees, costs of testing and remediation costs, incurred by Landlord in connection with any breach by Tenant of Tenant's obligations under this Article 15.

Section 15.05.  Existing Conditions.  Notwithstanding anything contained in this Article 15 to the contrary, Tenant shall not have any liability to Landlord under this Article 15 resulting from any conditions existing, or events occurring, or any Hazardous Substances existing or generated, at, in, on, under or in connection with the Leased Premises prior to the Commencement Date of this Lease (or any earlier occupancy of the Leased Premises by Tenant) except to the extent that Tenant or any assignee or subtenant of Tenant, or any of their respective employees, agents, contractors, representatives, guests, customers or invitees exacerbates the same.

Section 15.06.  Landlord's Representation.  Landlord represents that to Landlord's actual knowledge, neither Landlord nor any predecessor owner of the Building or underlying land has treated, stored or disposed of any Hazardous Substances upon or within the Building or underlying land.

Section 15.07.  Interpretation.  The obligations imposed upon Tenant under this Article 15 are in addition to and are not intended to limit, but to expand upon, the obligations imposed upon Tenant under Article 5 above.

Section 15.08.  Survival.  The covenants and obligations under this Article 15 shall survive the expiration or earlier termination of this Lease.

## ARTICLE 16 - MISCELLANEOUS

Section 16.01. <u>Benefit of Landlord and Tenant</u>. This Lease shall inure to the benefit of and be binding upon Landlord and Tenant and their respective successors and assigns.

Section 16.02. <u>Governing Law</u>. This Lease shall be governed by and construed in accordance with the laws of the jurisdiction where the Building is located.

Section 16.03. <u>Force Majeure</u>. Each of Landlord and Tenant (except with respect to the payment of any monetary obligation) shall be excused for the period of any delay in the performance of any obligation hereunder when such delay is occasioned by causes beyond its control, including, but not limited, to work stoppages, boycotts, slowdowns or strikes; shortages of materials, equipment, labor or energy; unusual weather conditions; or acts, omissions or delays of action of governmental or political bodies (any such occurrence herein referred to as "Force Majeure").

Section 16.04. <u>Examination of Lease</u>. Submission of this instrument by Landlord to Tenant for examination or signature does not constitute an offer by Landlord to lease the Leased Premises. This Lease shall become effective, if at all, only upon the execution by and delivery to both Landlord and Tenant. Execution and delivery of this Lease by Tenant to Landlord constitutes an offer to lease the Leased Premises on the terms contained herein. The offer by Tenant will be irrevocable until 6:00 p.m. EST, fifteen (15) days after the date Landlord receives this Lease executed by Tenant.

Section 16.05. <u>Indemnification for Leasing Commissions</u>. Each of Landlord and Tenant hereby represents and warrants that the only real estate brokers involved in the negotiation and execution of this Lease are the Brokers and that no other party is entitled, as a result of its actions, to a commission or other fee resulting from the execution of this Lease. Each of Landlord and Tenant shall indemnify the other from any and all liability for the breach of this representation and warranty on its part and shall pay any compensation to any other broker or person who may be entitled thereto. Landlord shall pay any commissions due the Brokers based on this Lease pursuant to separate agreements between Landlord and Brokers.

Section 16.06. <u>Notices</u>. Any notice required or permitted to be given under this Lease or by any Laws shall be deemed to have been given if it is written and delivered in person or by overnight courier or mailed by certified mail, postage prepaid, to the party who is to receive such notice at the address specified in <u>Section 1.01(l)</u>. If delivered in person, the notice shall be deemed given as of the delivery date. If sent by overnight courier, the notice shall be deemed to have been given as of the date of delivery. If mailed by certified mail, the notice shall be deemed to have been given on the date that is three (3) business days following mailing. Rejection or other refusal by the addressee to accept or the inability of the carrier to deliver because of a changed address of which no notice was given shall be deemed to be the receipt of the notice sent. Either party may change its address by giving written notice thereof to the other party.

Section 16.07. <u>Partial Invalidity; Complete Agreement</u>. If any provision of this Lease shall be held to be invalid, void or unenforceable, the remaining provisions shall remain in full force and effect. This Lease represents the entire agreement between Landlord and Tenant covering everything agreed upon or understood in this transaction. There are no oral promises, conditions, representations, understandings, interpretations or terms of any kind as conditions or inducements to the execution hereof or in effect between the parties. No change or addition shall be made to this Lease except by a written agreement executed by Landlord and Tenant.

Section 16.08.  Financial Statements.  During the Lease Term and any extensions thereof, Tenant shall provide to Landlord, within thirty (30) days following Landlord's request (which request shall not be made more than annually), a copy of Tenant's most recent financial statements prepared as of the end of Tenant's fiscal year.  Such financial statements shall be signed by Tenant or an officer of Tenant, if applicable, who shall attest to the truth and accuracy of the information set forth in such statements, or if the Minimum Annual Rent hereunder exceeds $100,000.00, said statements shall be certified and audited.  All financial statements provided by Tenant to Landlord hereunder shall be prepared in conformity with generally accepted accounting principles, consistently applied.

Section 16.09.  Representations and Warranties.

(a)      Tenant hereby represents and warrants that (i) Tenant is duly organized, validly existing and in good standing (if applicable) in accordance with the laws of the jurisdiction under which it was organized; (ii) Tenant is authorized to do business in the jurisdiction where the Building is located; and (iii) the individual(s) executing and delivering this Lease on behalf of Tenant has been properly authorized to do so, and such execution and delivery shall bind Tenant to its terms.

(b)      Landlord hereby represents and warrants that (i) Landlord is duly organized, validly existing and in good standing (if applicable) in accordance with the laws of the jurisdiction under which it was organized; (ii) Landlord is authorized to do business in the jurisdiction where the Building is located; and (iii) the individual(s) executing and delivering this Lease on behalf of Landlord has been properly authorized to do so, and such execution and delivery shall bind Landlord to its terms.

Section 16.10.  Consent or Approval.  Where the consent or approval of a party is required, such consent or approval will not be unreasonably withheld, conditioned or delayed.

Section 16.11.  Time.  Time is of the essence of each term and provision of this Lease.

Section 16.12.  Anti-Corruption Laws and Sanctions.  For purposes hereof, (a) "Anti-Corruption Laws" shall mean all Laws applicable to a pertinent party from time to time concerning or relating to bribery or anti-corruption; (b) "Sanctions" shall mean all applicable economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (i) the U.S. federal government, including those administered by the Office of Foreign Assets Control, the United States Department of Treasury ("OFAC") or the U.S. Department of State, or (ii) the United Nations Security Council, the European Union, any European Union member state in which a pertinent party or any of its subsidiaries conduct operations or Her Majesty's Treasury of the United Kingdom; and (c) "Sanctioned Person" shall mean, at any time, (i) any person or entity listed in any Sanctions-related list of designated persons or entities maintained by OFAC, the U.S. Department of State, or by the United Nations Security Council, the European Union or any European Union member state in which the pertinent party or any of its subsidiaries conducts operations, (ii) unless otherwise authorized by OFAC, any person or entity operating, organized or resident in any country or territory which is itself the subject or target of any full-scope (non-list based) Sanctions, or (iii) any ownership of fifty percent (50%) or more of an entity by persons or entities described in the foregoing clauses (i) or (ii).  Each of Landlord and Tenant represents and warrants that neither it nor any of its subsidiaries, nor to its knowledge, their respective directors, officers, employees or agents, is a Sanctioned Person.  Each party further represents that it and its subsidiaries, and to its knowledge, their respective directors, officers, employees and agents, complies and shall continue to comply in all material respects with all Sanctions and with all Anti-Corruption Laws.  Each party will use reasonable efforts to notify the other in writing if any of the foregoing representations and warranties are no longer true or have been breached or if such party has a reasonable

24

basis to believe that they may no longer be true or have been breached.  In the event of any violation of this Section by Tenant, Landlord will be entitled to immediately terminate this Lease and take such other actions as are permitted or required to be taken under law or in equity.

Section 16.13.  Cooperation.  Tenant shall use reasonable efforts to cooperate with Landlord, without cost to Tenant, in connection with the completion of any written surveys or evaluations relating to the Building, the Park or Landlord.

Section 16.14.  Radon Gas.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county public health unit.

Section 16.15.  Subordination of Landlord's Lien.  Landlord does hereby agree to subordinate any statutory lien on Tenant's Property granted to Landlord to the lien of any lender providing financing to Tenant that is secured by Tenant's trade fixtures, equipment, inventory or other personal property located at the Leased Premises, all pursuant to a landlord lien subordination agreement in form and substance reasonably satisfactory to Landlord.

## ARTICLE 17 - SPECIAL STIPULATIONS

Section 17.01.  Options to Extend.

(a)     Grant and Exercise of Options.  Provided that (i) no default has occurred and is then continuing, (ii) the creditworthiness of Tenant is then reasonably acceptable to Landlord, and (iii) Tenant originally named herein remains in possession of the Leased Premises, Tenant shall have the option to extend the Lease Term for two (2) additional periods of five (5) years each (each an "Extension Term").  Each Extension Term shall be upon the same terms and conditions contained in the Lease except (x) this provision giving two (2) extension options shall be amended to reflect the remaining options to extend, if any, (y) any improvement allowances or other concessions applicable to the Leased Premises under the Lease shall not apply to the Extension Term, and (z) the Minimum Annual Rent shall be adjusted as set forth below (the "Rent Adjustment").  Tenant shall exercise each option by delivering to Landlord, no later than two hundred seventy (270) days prior to the expiration of the preceding term, written notice of Tenant's desire to extend the Lease Term.  Tenant's failure to timely exercise such option shall be deemed a waiver of such option and any succeeding option.  Landlord shall notify Tenant of the amount of the Rent Adjustment no later than one hundred eighty (180) days prior to the commencement of the Extension Term.  Tenant shall have ten (10) business days in which to accept or decline the Rent Adjustment.  Tenant shall be deemed to have accepted the Rent Adjustment if it fails to deliver to Landlord a written objection thereto within said ten (10) business days period.  If Tenant properly exercises its option to extend, Landlord and Tenant shall execute an amendment to the Lease (or, at Landlord's option, a new lease on the form then in use for the Building) reflecting the terms and conditions of the Extension Term within thirty (30) days after Tenant's acceptance (or deemed acceptance) of the Rent Adjustment.

(b)     Rent Adjustment.  The Minimum Annual Rent for the applicable Extension Term shall be an amount equal to the Minimum Annual Rent then being quoted by Landlord to prospective renewal tenants of the Building for space of comparable size and quality and with similar or equivalent improvements as are found in the Building, and if none, then in similar buildings in the vicinity;

provided, however, that in no event shall the Minimum Annual Rent during any Extension Term be less than the highest Minimum Annual Rent payable during the immediately preceding term. The Monthly Rental Installments shall be an amount equal to one-twelfth (1/12) of the Minimum Annual Rent for the Extension Term and shall be paid at the same time and in the same manner as provided in the Lease.

Section 17.02. Option to Terminate. Provided that (a) no default has occurred and is then continuing, and (b) Tenant originally named herein remains in possession of the Leased Premises, Tenant shall have the right to terminate this Lease effective as of the date that is the last day of the sixtieth (60th) month of the Lease Term. In order to exercise such termination right, Tenant shall notify Landlord of such exercise in writing at least one hundred eighty (180) days prior to the effective date of such termination, and together with such notice, Tenant shall deliver to Landlord, as an agreed upon termination fee, an amount equal to Four Hundred Seven Thousand Three Hundred Ninety-Six and 81/100 Dollars ($407,396.81). Such payment is made in consideration for Landlord's grant of this option to terminate to compensate Landlord for rental and other concessions given to Tenant and for other good and valuable consideration. The termination fee does not constitute payment of rent to Landlord. If Tenant fails to notify Landlord or pay the termination fee by the deadline set forth above, Tenant shall have waived Tenant's termination right for the remainder of the Lease Term and any extensions thereof.

Section 17.03. Compliance with Law.

(a)     Existing Governmental Regulations. If any federal, state or local laws, ordinances, orders, rules, regulations or requirements (collectively, "Governmental Requirements") in existence as of the date of the Lease require an alteration or modification of the Leased Premises (a "Code Modification") and such Code Modification (i) is not made necessary as a result of the specific use being made by Tenant of the Leased Premises (as distinguished from an alteration or improvement which would be required to be made by the owner of any office building comparable to the Building irrespective of the use thereof by any particular occupant), and (ii) is not made necessary as a result of any alteration of the Leased Premises by Tenant, such Code Modification shall be performed by Landlord, at Landlord's sole cost and expense.

(b)     Governmental Regulations – Landlord Responsibility. If, as a result of one or more Governmental Requirements that are not in existence as of the date of this Lease, it is necessary from time to time during the Lease Term, to perform a Code Modification to the Building or the Common Areas that (i) is not made necessary as a result of the specific use being made by Tenant of Leased Premises (as distinguished from an alteration or improvement which would be required to be made by the owner of any office building comparable to the Building irrespective of the use thereof by any particular occupant), and (ii) is not made necessary as a result of any alteration of the Leased Premises by Tenant, such Code Modification shall be performed by Landlord and the cost thereof shall be included in Operating Expenses without being subject to any applicable cap on expenses set forth herein.

(c)     Governmental Regulations – Tenant Responsibility. If, as a result of one or more Governmental Requirements, it is necessary from time to time during the Lease Term to perform a Code Modification to the Building or the Common Areas that is made necessary as a result of the specific use being made by Tenant of the Leased Premises or as a result of any alteration of the Leased Premises by Tenant, such Code Modification shall be the sole and exclusive responsibility of Tenant in all respects; provided, however, that Tenant shall have the right to retract its request to perform a proposed alteration in the event that the performance of such alteration would trigger the requirement for a Code Modification.

[Signatures contained on following page]

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first above written.

LANDLORD:

WITNESSES:

DUKE REALTY LIMITED PARTNERSHIP, an Indiana limited partnership

Printed Name: _____

By:   Duke Realty Corporation, an Indiana
      corporation, its General Partner

Printed Name: _Ana M Hernandez_

By: _____
      Edward P. Mitchell
      Senior Vice President
      Florida Operations

Date of execution: _3/13/2017_

TENANT:

WITNESSES:

EVOLUTION LIGHTING, LLC, a Delaware limited liability company

Printed Name: _Jessica Falloshy_

By: _____
      Name: _____
      Title: _____

Printed Name: _Pamela Kenney_

Date of execution: _March 16, 2017_

f:\florida market\leases\evolution lighting.8(final).doc

28

## EXHIBIT A

### SITE PLAN OF LEASED PREMISES



Pembroke Pointe 880 – First Floor

**EXHIBIT B**

**TENANT IMPROVEMENTS**

1.      <u>Landlord's Obligations</u>.  Tenant has personally inspected the Leased Premises and accepts the same **"AS IS"** without representation or warranty by Landlord of any kind and with the understanding that Landlord shall have no responsibility with respect thereto except to construct and install within the Leased Premises, in a good and workmanlike manner, the Tenant Improvements, in accordance with this **Exhibit B**.

2.      <u>Construction Drawings and Tenant Contribution</u>.

(a)     On or before the thirtieth (30th) day following the date hereof, Landlord shall prepare and submit to Tenant a set of permittable construction drawings (the "CDs") covering all work to be performed by Landlord in constructing and installing the Tenant Improvements, which shall be based on the scope of work attached as **Exhibit B-1** hereto.  Tenant shall have five (5) business days after receipt of the CDs in which to review the CDs with Landlord and to give to Landlord written notice of Tenant's approval of the CDs or its requested changes to the CDs.  Tenant shall have no right to request any changes to the CDs that would increase the scope of work or materially alter the exterior appearance or basic nature of the Building or the Building systems.  If Tenant fails to approve or request changes to the CDs within five (5) days after its receipt thereof, then Landlord shall deliver to Tenant a written reminder notice.  If Tenant fails to respond within two (2) business days of the reminder notice, then Tenant shall be deemed to have approved the CDs and the same shall thereupon be final.  If Tenant requests any changes to the CDs, Landlord shall make those changes which are reasonably requested by Tenant and shall within ten (10) days of its receipt of such request submit the revised portion of the CDs to Tenant. Tenant may not thereafter disapprove the revised portions of the CDs unless Landlord has unreasonably failed to incorporate reasonable comments of Tenant and, subject to the foregoing, the CDs, as modified by said revisions, shall be deemed to be final upon the submission of said revisions to Tenant.  Tenant shall at all times in its review of the CDs, and of any revisions thereto, act reasonably and in good faith. Without limiting the foregoing, Tenant agrees to confirm Tenant's consent to the CDs in writing within three (3) days following Landlord's written request therefor.

(b)     The Tenant Improvements shall be constructed at the shared expense of Landlord and Tenant as follows:  (i) Tenant shall contribute an amount equal to Seventeen Thousand Five Hundred Sixteen and No/100 Dollars ($17,516.00) (the "Tenant Contribution") towards the cost of the Tenant Improvements and the construction fees associated therewith, which Tenant Contribution shall be paid by Tenant to Landlord in full on the date of Substantial Completion of the Tenant Improvements; and (ii) all costs in excess of the Tenant Contribution associated with construction of the Tenant Improvements described in the Scope of Work shall be paid by Landlord (except in the event of a Change Order requested by Tenant).

3.      <u>Schedule and Early Access</u>.  Landlord shall provide Tenant with a proposed schedule for the construction and installation of the Tenant Improvements and shall notify Tenant of any material changes to said schedule.  Tenant agrees to coordinate with Landlord regarding the installation of Tenant's phone and data wiring and any other trade related fixtures that will need to be installed in the Leased Premises prior to Substantial Completion.  In addition, if and to the extent permitted by applicable laws, rules and ordinances, Tenant shall have the right to enter the Leased Premises for thirty (30) days prior to the scheduled date for Substantial Completion (as may be modified from time to time) in order to install fixtures and otherwise prepare the Leased Premises for occupancy, which right shall

expressly exclude making any structural modifications.  During any entry prior to the Commencement Date (a) Tenant shall comply with all terms and conditions of this Lease other than the obligation to pay rent, (b) Tenant shall not interfere with Landlord's completion of the Tenant Improvements, (c) Tenant shall cause its personnel and contractors to comply with the terms and conditions of Landlord's rules of conduct (which Landlord agrees to furnish to Tenant upon request), and (d) Tenant shall not begin operation of its business.  Tenant acknowledges that Tenant shall be responsible for obtaining all applicable permits and inspections relating to any such early access by Tenant.

4.      Change Orders.  Tenant shall have the right to request changes to the CDs at any time following the date hereof by way of written change order (each, a "Change Order", and collectively, "Change Orders").  Provided such Change Order is reasonably acceptable to Landlord, Landlord shall prepare and submit promptly to Tenant a memorandum setting forth the impact on cost and schedule resulting from said Change Order (the "Change Order Memorandum of Agreement").  Tenant shall, within three (3) business days following Tenant's receipt of the Change Order Memorandum of Agreement, either (a) execute and return the Change Order Memorandum of Agreement to Landlord, or (b) retract its request for the Change Order.  At Landlord's option, Tenant shall pay to Landlord (or Landlord's designee), within ten (10) days following Landlord's request, any increase in the cost to construct the Tenant Improvements resulting from the Change Order, as set forth in the Change Order Memorandum of Agreement.  Landlord shall not be obligated to commence any work set forth in a Change Order until such time as Tenant has delivered to Landlord the Change Order Memorandum of Agreement executed by Tenant and, if applicable, Tenant has paid Landlord in full for said Change Order.

5.      Tenant Delay.  Notwithstanding anything to the contrary contained in the Lease, if Substantial Completion of the Tenant Improvements is delayed as a result of Tenant Delay (as hereinafter defined), then, for purposes of determining the Commencement Date, Substantial Completion of the Tenant Improvements shall be deemed to have occurred on the date that Substantial Completion of the Tenant Improvements would have occurred but for such Tenant Delay.  Without limiting the foregoing, Landlord shall use commercially reasonable speed and diligence to Substantially Complete the Tenant Improvements on or before the Target Commencement Date.

6.      Letter of Understanding.  Promptly following the Commencement Date, Tenant shall execute Landlord's Letter of Understanding in substantially the form attached hereto as **Exhibit C** and made a part hereof, acknowledging (a) the Commencement Date of this Lease, and (b) except for any Punchlist (as hereinafter defined) items, that Tenant has accepted the Leased Premises.  If Tenant takes possession of and occupies the Leased Premises, Tenant shall be deemed to have accepted the Leased Premises and that the condition of the Leased Premises and the Building was at the time satisfactory and in conformity with the provisions of this Lease in all respects, subject to any Punchlist items.

7.      Punchlist.  Promptly following Substantial Completion of the Tenant Improvements, Landlord and Tenant shall prepare a punchlist of incomplete or defective work (the "Punchlist").  Landlord shall, within thirty (30) days after the Punchlist is prepared and agreed upon by Landlord and Tenant, complete such incomplete items and remedy such defective work as are set forth on the Punchlist; provided however, that to the extent that completion of any items on the Punchlist may be affected by weather or seasonal conditions, or require unusually long lead times, such 30-day period shall be extended as reasonably necessary.  The Punchlist shall not be determinative of whether or not the Tenant Improvements are Substantially Complete.

8.    Definitions.  For purposes of this Lease (a) "Substantial Completion" (or any grammatical variation thereof) shall mean completion of construction of the Tenant Improvements, subject only to punchlist items to be identified by Landlord and Tenant in a joint inspection of the Leased Premises prior to Tenant's occupancy, as established by a certificate of occupancy for the Leased Premises or other similar authorization issued by the appropriate governmental authority, if required, and (b) "Tenant Delay" shall mean any delay in the completion of the Tenant Improvements attributable to Tenant, including, without limitation (i) Tenant's failure to meet any time deadlines specified herein, (ii) Change Orders, (iii) the performance of any other work in the Leased Premises by any person, firm or corporation employed by or on behalf of Tenant, or any failure to complete or delay in completion of such work, (iv) Landlord's inability to obtain an occupancy permit for the Leased Premises because of the need for completion of all or a portion of improvements being installed in the Leased Premises directly by Tenant, and (v) any other act or omission of Tenant.

9.    Penalties.  Provided that this Lease is executed by Tenant and delivered to Landlord on March 10, 2017, and the Letter of Credit is delivered to Landlord on or before March 14, 2017, Landlord agrees that if Substantial Completion of the Tenant Improvements is delayed beyond the thirtieth (30th) day following the Target Commencement Date, as such date may be extended as a result of Tenant Delay or Force Majeure (such date, as may be so extended, being referred to herein as the "Outside Date"), Tenant shall receive one (1) day of free rent for each day after the Outside Date that the Tenant Improvements are not Substantially Complete.  Except as set forth in this Section 9, no liability whatsoever shall arise or accrue against Landlord by reason of its failure to Substantially Complete the Tenant Improvements on or before the Target Commencement Date.

## **EXHIBIT B-1**

## **SCOPE OF WORK**

| | |
|---|---|
| **Job:** | **Evolution Lighting, LLC (EVOLIA-001)** |
| **Property:** | **Pembroke Pointe 880 (PBPPT001)** |
| **Customer:** | **Evolution Lighting, LLC** |

### General Details

| | | | | | |
|---|---|---|---|---|---|
| Estimate Date: | 03/09/2017 | Project Manager: | Ramiro Garcia | Office RSF: | 9,684 |
| Estimate Version No.: | J-8 | Leasing Agent: | Stephanie Rodriguez | Warehouse RSF: | 0 |
| | | | | Total RSF: | 9,684 |
| Arch. Drawings By: | TD Arch Group | Suite Number: | | | |
| Drawing Date: | | Building Type: | Office | | |

### Scope Details

| | Quantity | Units |
|---|---|---|
| **GENERAL COND/REQUIREMENTS** | | |
| General Conditions | | |
|     Tenant Finish Manager | 80 | HRS |
|     Project Superintendent | 100 | HRS |
|     Administrative Assistant | 36 | HRS |
| Regulatory Requirements/Fees | | |
|     Building Permit (Office) .05 // 300 | 1 | LS |
| Temp Construction Facilities | | |
|     Construction Chemical Toilets | 2 | MO |
|     Protect Existing Conditions | 1 | LS |
| Project Clean-up | | |
|     Construction Clean Up | 30 | HRS |
|     Final Cleaning | 9,684 | SF |
|     Roll-Off Dumpsters | 6 | EA |
| Design/Engineering/Consultants | | |
|     Architectural Construction Documents | 9,684 | SF |
|     Interior Space Planning | 9,684 | SF |
|     MEP Design | 9,684 | SF |
| | | |
| **EXISTING CONDITIONS** | | |
| Demolition | | |
|     Demo Power Floor Outlet (7 floor outlets @ 5 Cubicle groups) | 7 | EA |
| | | |
| **WOOD, PLASTICS, AND COMPOSITES** | | |
| Rough Carpentry | | |
|     Blocking For Millwork @ Breakroom & Blocking @ IT Closet & TV Blocking @ 2 Conference Room + 1 @ Breakroom + 1 @ Creative Space | 65 | LF |
| Finish Carpentry | | |
|     Base Cabinets & Countertop (Plastic Laminate) @ Breakroom | 20 | LF |
|     Upper Cabinets (Plastic Laminate) @ Breakroom | 20 | LF |

**Job:**  **Evolution Lighting, LLC (EVOLIA-001)**
**Property:**  **Pembroke Pointe 880 (PBPPT001)**
**Customer:**  **Evolution Lighting, LLC**

## Scope Details

| | Quantity | Units |
|---|---|---|
| **OPENINGS** | | |
| Doors, Frames and Hardware | | |
| Solid Core Painted Maple Door With Standard Hinges & KD Frame - 4' Wide X Full Height (8') - (Copy-Mail Room) | 1 | EA |
| Hollow Metal Door & Welded Hollow Metal Frame - 4' X 7' | 1 | EA |
| Solid Core Painted Maple Door With Standard Hinges & Aluminum Frame - 3' Wide X Full Height (8') - office typical | 19 | EA |
| Duke Realty Maintenance Hardware/Rekeying | 28 | EA |
| Entrnce, Strfrnts & Crtn Walls | | |
| Glass Double Door Opening @ 6' X 8' With Standard Hardware, Top & Bottom Rails @ Showroom (no frosting) | 1 | EA |
| Interior 3/8" Laminated Butt Glass Partition Wall System Mounted In A Top / Bottom Aluminum Track (@ 13 Private Offices - Door frame w/ 60" Sidelite-not in Office #7,10) w/3 foot Horizontal Frosted strip | 13 | EA |
| ¼" Glass Insert Kits @ 15 Doors (does not include 3M frosting on the glass.) | 15 | EA |
| Glass Partition Wall System Mounted In A Top / Bottom Aluminum Track w/Frame-less Single Glass Door (approx. 63 LF of wall + 2 Glass Doors @ 1 Conference Room walls & 1 Showroom wall only)  w/3 foot Horizontal Frosted strip | 567 | SF |
| Frost Tint @ 2 Office Doors Glass Insert Kits | 2 | EA |
| | | |
| **FINISHES** | | |
| Gypsum Board Assemblies | | |
| Columns and Perimeter Knee Wall Framing and Sheathing & drywall soffit setback @ top of ext mullion | 260 | LF |
| Construct Drywall Ceiling - Metal Stud (@ Lobby + IT Closet only) | 874 | SF |
| Interior Space-Perimeter Partitions: one layer of 5/8" drywall both sides of metal studs | 250 | SF |
| Construct 14'-0" Walls To Deck W/ Metal Studs And 5/8" Drywall To Deck. Drywall Finished to 9'-0" (@ conference and office #6,7,8) | 127 | LF |
| Construct 9'-0" Walls To 6" Above Grid W/ Metal Studs And 5/8" Drywall (Typ Office) | 278 | LF |
| Tiling | | |
| Luxury Vinyl Tile (thinner) - Mohawk Merikato/Antietor equal (LVT - Conference Room, Lobby and Hall) | 1,322 | SF |
| Acoustical Ceilings | | |
| Building Standard "Dune" 2' X 2' Square Edge Acoustic Ceiling Tile W/ 15/16" Grid - Office Product | 8,810 | SF |
| Flooring | | |
| Seal Existing Concrete Floor Area With Sealer (Creative Space, Lab, Showroom, Break Room & IT) | 1,938 | SF |
| Vinyl Base 4" (throughout) | 1,312 | LF |
| Luxury Vinyl Tile (thinner) - Mohawk Merikato/Antietor equal (LVT - 15 offices only) | 2,638 | SF |
| 24"x24" Carpet Tile (Industry Standard Shaw or Equal Mfg) - throughout (incl. open area & mail room) | 422 | SY |
| Floor Preparation | 9,684 | SF |
| Interior Painting & Finishes | | |
| Interior Painting-Ceilings (@ Lobby & IT Closet only) | 874 | SF |
| Paint All Drywall W/ Two Coats Of Latex Paint | 12,300 | SF |
| | | |
| **SPECIALTIES** | | |
| Fire Protection Specialties | | |
| Provide Fire Extinguisher With Recessed Cabinet | 6 | EA |
| | | |
| **FURNISHINGS** | | |
| Window Treatments | | |
| Window Treatments (Building Standard 4" Blinds) | 30 | EA |

**Job:** **Evolution Lighting, LLC (EVOLIA-001)**
**Property:** **Pembroke Pointe 880 (PBPPT001)**
**Customer:** **Evolution Lighting, LLC**

## Scope Details

| | Quantity | Units |
|---|---|---|
| **FIRE SUPPRESSION** | | |
| Fire Suppression Systems | | |
| Add Sprinkler Heads To Match New Floor Plan (Office) | 122 | EA |
| Minimum Trip Charge | 2 | EA |
| | | |
| **PLUMBING** | | |
| Plumbing System | | |
| Add 3 waterlines (Water cooler For Standalone Water dispenser, dishwasher & coffeemaker) | 3 | EA |
| Single Bowl Stainless Steel Sink And Faucet (complete w/ Tank Pump) | 1 | EA |
| Continuous Flow Hot Water Heater | 1 | EA |
| Refrigerator Icemaker Connection (Equipment By Others) | 2 | EA |
| | | |
| **HEAT,VENT,AND AIR COND (HVAC)** | | |
| HVAC System | | |
| Mini-Split Type Dedicated Cooling System (@ IT Closet) | 1 | EA |
| VAV Box (Conference Room) Cooling Only | 2 | EA |
| Standard Office Space HVAC System Consisting Of VAV Units. Units To Supply One CFM Per SF Of Office Area With A Complete Hard Duct Supply / One Supply Diffuser With Flex Duct Per 210 SF And One Plenum Return Air Grille Per 225 SF | 9,684 | SF |
| Add New Thermostat To Match New Floor Plan | 4 | EA |
| | | |
| **ELECTRICAL** | | |
| Electrical System | | |
| Quadraplex Receptacle - 15A/120V (1 @ each of 15 private offices) non dedicated | 15 | EA |
| Wall Junction Box (to connect future Tenant furnished & installed Furniture Work Stations with Power and Voice/Data - for desks not fed via floor box) | 4 | EA |
| Ceiling Junction Box per tenant Request (2 @ conference room & 1 @ creative space & 2 @ lobby) | 5 | EA |
| Wall Junction Boxes (for future Tenant furnished & installed raceways @ Showroom walls) | 3 | EA |
| Ceiling Junction Boxes To Connect power for future Tenant Supplied light fixtures @ showroom) | 5 | EA |
| Ceiling Junction Box per tenant Request (for future Tenant furnished & installed cubicle strip lights) | 6 | EA |
| 50 Amp/220 Volt (Dedicated) receptacle in IT closet | 1 | EA |
| (3) 30 AMP/120 Volt (Dedicated) Hubbell HBL2610 AC Receptacles NEMA L5-30 Femal at IT closet | 3 | EA |
| Floor Box - Power And Tele/Data (7 total floor outlets @ 5 Cubicle groups + 2 @ conference room) | 7 | EA |
| Provide 15A 277V Circuit For VAV Box | 1 | EA |
| Duplex Receptacle - 15 Amp/120 Volt (typ @ private office) non dedicated | 80 | EA |
| Duplex Receptacle - 20 Amp/120 Volt GFI (5 counter height + 2 fridges , 1 dishwasher & 1 water cooler@ Break room) | 9 | EA |
| Duplex Receptacle - 20 Amp/120 Volt (2 @ Copy room, 2 @ creative space, Conf Room TV, 2 extra for a plotter & another copier, TV @ break room, TV @ Creative Sapce) | 9 | EA |
| Insti-Hot Hook-Up With A 120 Volt Circuit | 1 | EA |
| Telephone Board 4' X 8' w/Dedicated Duplex Receptacle & Ground Bar (includes  conduit run for Tenant IT closet to building DEMARC) | 1 | EA |
| Telephone/Data Stubup W/ Box & Pull String | 80 | EA |
| Electrical Distribution | | |
| Dedicated Elec. Panel for Showroom & Lobby | 1 | LS |
| Electrical Service Distribution | 1 | LS |
| Interior Lighting | | |
| Parabolic Light Fixture w/Florescent Bulbs - 2' x 4' (1/3 w/Battery Back-Up) | 145 | EA |
| Four Way Light Switch | 4 | EA |
| Single Pole Switch W/Occupancy Sensor | 25 | EA |

**Job:** **Evolution Lighting, LLC (EVOLIA-001)**
**Property:** **Pembroke Pointe 880 (PBPPT001)**
**Customer:** **Evolution Lighting, LLC**

| Scope Details | | |
|---|---|---|
| | Quantity | Units |
| **ELECTRONIC SAFETY AND SECURITY** | | |
| Fire Alarm Systems | | |
| Horn / Strobe Fire Alarm Unit (Design Build) | 1 | LS |
| Edgelite Exit Light | 8 | EA |
| Ceiling Mounted Smoke Detector Zoned At Fire Panel | 4 | EA |
| | | |
| **SUBJOB 1** | | |
| Project Contingency | | |
| Job Specific (Contingency) | 1 | LS |

| Exclusions / Qualifications / Alternates | |
|---|---|

**Exclusions**
see attached exclusions

**Qualifications**
see attached qualifications

**Alternates**
There are no alternates.

**Job:** **Evolution Lighting (EVOLIA-001)**
**Property:** **Pembrook Pointe 880 (PBPPT001)**
**Customer:** **Evolution Lighting**
**Date:** **Wednesday, March 8, 2017**

### Attachment to Lease "Scope of Work" # J-8

| Exclusions: | |
|---|---|
| 1 | Voice/Data |
| 2 | Security |
| 3 | Counters / Desk @ Reception |
| 4 | Furniture |
| 5 | Appliances |
| 6 | Interior office signage |
| 7 | Installation of Tenant lighting (Pendant Light Fixtures @ Conference Rooms or Lobby / Sconces, Strip lights, Raceways, or any non-standard light fixtures) |
| 8 | No Showroom Electrified ceiling grid has been included in this proposal due to lack of info from Tenant (standard office grid included) |
| 9 | Generator and all associated equipment including but not limited to switch gear-transfer switch- wiring- permit- design or installation |
| 10 | Wi-Fi / Access Points |
| 11 | Hard Wire Furniture (Cubicles etc. ) |
| 12 | Curved wall near corner of office. |

| Qualifications: | |
|---|---|
| 1 | Above costs are based on work being performed during normal working hours |
| 2 | It will be the responsibility of the tenant to move all furniture, personal items, computer electronics and communications equipment unless otherwise noted in the above scope. |
| 3 | All office finishes are industry standard allowances (unless otherwise noted). |
| 4 | All new ceiling tile and grid in office area to be installed at 9' AFF. |
| 5 | Typical interior office walls extend 6" above Ceiling Grid (unless otherwise noted). |
| 6 | Break room 4" back splashes to match plastic laminate counter tops. |
| 7 | All private offices have typical one quad power (non dedicated), one data outlet (3 offices per circuit) & one duplex on opposite wall. |
| 8 | All millwork shall be ADA compliant and will be plastic laminate |
| 9 | Exterior window blinds are building standard 4" vertical window blinds (to match Building Standard). |
| 10 | Dedicated power included only at copier locations and IT closet as noted (unless otherwise noted on "Scope of work") |
| 11 | Flourecent Parabolic 2x4 Lights throughout (unless otherwise noted). |
| 12 | Dedicated cooling in IT closet. Tenant to provide all planned IT Closet equipment cutsheets indicating heat loads/BTUs for Engineers to calculate proper cooling within 5 days of lease execution. |
| 13 | Exposed/Sealed Concrete Floors @ Showroom, Break Room, Lab & Creative Space |

Exhibit B-1
Page 4 of 5



## EXHIBIT C

**FORM OF LETTER OF UNDERSTANDING**

Duke Realty Limited Partnership
c/o Duke Realty Corporation
Attn.: Florida Market – V.P., Asset Mgmt. & Customer Service
2400 North Commerce Parkway, Suite 405
Weston, FL 33326

      RE:     Office Lease between Duke Realty Limited Partnership, an Indiana limited partnership ("Landlord") and Evolution Lighting, LLC, a Delaware limited liability company ("Tenant") for the Leased Premises located at 880 Southwest 145th Avenue, Pembroke Pines, Florida 33027 (the "Leased Premises"), within Pembroke Pointe, dated _____ (the "Lease").

Dear _____:

      The undersigned, on behalf of Tenant, certifies to Landlord as follows:

1.     The Commencement Date under the Lease is _____.

2.     The rent commencement date is _____.

3.     The expiration date of the Lease is _____.

4.     The Lease (including amendments or guaranty, if any) is the entire agreement between Landlord and Tenant as to the leasing of the Leased Premises and is in full force and effect.

5.     Landlord has completed the improvements designated as Landlord's obligation under the Lease (excluding Punchlist items as agreed upon by Landlord and Tenant), if any, and Tenant has accepted the Leased Premises as of the Commencement Date.

6.     To the best of the undersigned's knowledge, there are no uncured events of default by either Tenant or Landlord under the Lease.

      IN WITNESS WHEREOF, the undersigned has caused this Letter of Understanding to be executed this _____ day of _____, 20_____.

## EXHIBIT ONLY – NOT TO BE EXECUTED

Exhibit C
Page 1 of 1

## EXHIBIT D

## RULES AND REGULATIONS

      1.      The sidewalks, entrances, passages, courts, elevators, vestibules, stairways, corridors or halls shall not be obstructed or used for any purpose other than ingress and egress.  Landlord shall control the Common Areas.

      2.      No awnings or other projections shall be attached to the outside walls of the Building.  No curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Leased Premises other than Landlord standard window coverings without Landlord's prior written approval.  All electric ceiling fixtures hung in offices or spaces along the perimeter of the Building must be either LED or fluorescent (at Tenant's option), of a quality, type, design and tube color approved by Landlord.  Neither the interior nor the exterior of any windows shall be coated or otherwise sunscreened without written consent of Landlord.

      3.      No sign, advertisement, notice or handbill shall be exhibited, distributed, painted or affixed by any tenant on, about or from any part of the Leased Premises, the Building or in the Common Areas including the parking area without the prior written consent of Landlord.  In the event of the violation of the foregoing by any tenant, Landlord may remove or stop same without any liability, and may charge the expense incurred in such removal or stopping to tenant.  The lobby directory will be provided exclusively for the display of the name and location of tenants only, and Landlord reserves the right to exclude any other names therefrom.  Nothing may be placed on the exterior of corridor walls or corridor doors other than Landlord's standard lettering.

      4.      The sashes, sash doors, windows, and doors that reflect or admit light and air into halls, passageways or other public places in the Building shall not be covered or obstructed by tenant.

      5.      The sinks and toilets and other plumbing fixtures shall not be used for any purpose other than those for which they were constructed, and no sweepings, rubbish, rags, or other substances shall be thrown therein.  All damages resulting from any misuse of the fixtures shall be borne by the tenant who, or whose subtenants, assignees or any of their servants, employees, agents, visitors or licensees shall have caused the same.

      6.      No tenant shall mark, paint, drill into, or in any way deface any part of the Leased Premises or the Building (except for nails for the display of artwork).  No boring, cutting or stringing of wires or laying of any floor coverings shall be permitted, except with the prior written consent of Landlord and as Landlord may direct.  Landlord shall direct electricians as to where and how telephone or data cabling are to be introduced.  No boring or cutting for wires or stringing of wires will be allowed without written consent of Landlord.  The location of telephones, call boxes and other office equipment affixed to the Leased Premises shall be subject to the approval of Landlord.

      7.      No vehicles, birds or animals of any kind (except service animals) shall be brought into or kept in or about the Leased Premises, and no cooking shall be done or permitted by any tenant on the Leased Premises, except microwave cooking, and the preparation of coffee, tea, hot chocolate and similar items for tenants and their employees.  No tenant shall cause or permit any unusual or objectionable odors to be produced in or permeate from the Leased Premises.

8.      The Leased Premises shall not be used for manufacturing or for the storage of merchandise except as such storage may be incidental to the permitted use of the Leased Premises.  No tenant shall occupy or permit any portion of the Leased Premises to be occupied as an office for the manufacture or sale of liquor, narcotics, or tobacco in any form, or as a medical office, or as a barber or manicure shop, or a dance, exercise or music studio, or any type of school or daycare or copy, photographic or print shop or an employment bureau without the express written consent of Landlord.  The Leased Premises shall not be used for lodging or sleeping or for any immoral or illegal purpose.

9.      No tenant shall make, or permit to be made any unseemly, excessive or disturbing noises or disturb or interfere with occupants of the Building, neighboring buildings in the Park or neighboring premises, whether by the use of any musical instrument, radio, phonograph, unusual noise, or in any other way.  No tenant shall throw anything out of doors, windows or down the passageways.

10.     No tenant, subtenant or assignee nor any of its servants, employees, agents, visitors or licensees, shall at any time bring or keep upon the Leased Premises any flammable, combustible or explosive fluid, chemical or substance or firearm in violation of any Laws.

11.     No additional locks or bolts of any kind shall be placed upon any of the doors or windows by any tenant, nor shall any changes be made to existing locks or the mechanism thereof.  Each tenant must upon the termination of his tenancy, restore to Landlord all keys of doors, offices, and toilet rooms, either furnished to, or otherwise procured by, such tenant and in the event of the loss of keys so furnished, such tenant shall pay to Landlord the cost of replacing the same or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such changes.

12.     No tenant shall overload the floors of the Leased Premises.  All damage to the floor, structure or foundation of the Building due to improper positioning or storage items or materials shall be repaired by Landlord at the sole cost and expense of tenant, who shall reimburse Landlord immediately therefor upon demand.  All removals or the carrying in or out of any safes, freight, furniture, or bulky matter of any description must take place during the hours that Landlord shall reasonably determine from time to time.  The moving of safes or other fixtures or bulky matter of any kind must be done upon previous notice to Landlord and under Landlord's supervision, and the persons employed by any tenant for such work must be acceptable to Landlord.  Landlord reserves the right to inspect all safes, freight or other bulky articles to be brought into the Building and to exclude from the Building all safes, freight or other bulky articles which violate any of these Rules and Regulations or the Lease of which these Rules and Regulations are a part.  Landlord reserves the right to prescribe the weight and position of all safes, which must be placed upon supports approved by Landlord to distribute the weight.

13.     Landlord shall have the right to prohibit any advertising by any tenant that, in Landlord's opinion tends to impair the reputation of the Building or its desirability as an office location, and upon written notice from Landlord any tenant shall refrain from or discontinue such advertising.

14.     The business hours for the Building shall be 8 a.m. to 6 p.m. Monday through Friday and 8 a.m. to 1 p.m. on Saturday, excluding legal holidays.  Landlord reserves the right to require all persons entering the Building between the hours of 6:00 p.m. and 8:00 a.m. and at all hours on Saturday, Sunday and legal holidays to register with Landlord's security personnel.  Each tenant shall be responsible for all persons entering the Building at tenant's invitation, express or implied.  Landlord shall in no case be liable for

Exhibit D
Page 2 of 4

damages for any error with regard to the admission to or exclusion from the Building of any person.  In case of an invasion, mob riot, public excitement or other circumstances rendering such action advisable in Landlord's opinion, Landlord reserves the right without any abatement of rent to require all persons to vacate the Building and to prevent access to the Building during the continuance of the same for the safety of the tenants and the protection of the Building and the property in the Building.

15.     No tenant shall purchase janitorial or maintenance or other like services, from any person or persons not approved by Landlord.  Any persons employed by any tenant to do janitorial work or other work in the Leased Premises shall, while in the Building and outside of the Leased Premises, be subject to and under the control and direction of Landlord (but not as an agent or servant of Landlord), and tenant shall be responsible for all acts of such persons.

16.     Canvassing, soliciting and peddling in the Building are prohibited, and each tenant shall report and otherwise cooperate to prevent the same.

17.     All office equipment of any electrical or mechanical nature shall be placed by tenant in the Leased Premises in settings that will, to the maximum extent possible, absorb or prevent any vibration, noise and annoyance.

18.     No air-conditioning unit or other similar apparatus shall be installed or used by any tenant without the written consent of Landlord.

19.     There shall not be used in any space, or in the public halls of the Building, either by any tenant or others, any hand trucks except those equipped with rubber tires and rubber side guards.

20.     The scheduling of tenant move-ins shall be before or after normal business hours and on weekends, subject to the reasonable discretion of Landlord.

21.     The Building is a smoke-free Building.  Smoking is strictly prohibited within the Building. Smoking shall only be allowed in areas designated as a smoking area by Landlord.  Tenant and its employees, representatives, contractors or invitees shall not smoke within the Building or throw cigar or cigarette butts or other substances or litter of any kind in or about the Building, except in receptacles for that purpose.  Landlord may, at its sole discretion, impose a charge against monthly rent of $50.00 per violation by tenant or any of its employees, representatives, contractors or invitees, of this smoking policy.

22.     Tenants will insure that all doors are securely locked, and water faucets, electric lights and electric machinery are turned off before leaving the Building.

23.     Parking spaces associated with the Building are intended for the exclusive use of passenger automobiles.  Except for intermittent deliveries, no vehicles other than passenger automobiles may be parked in a parking space without the express written permission of Landlord.  Tenant, its employees, customers, invitees and guests shall, when using the parking facilities in and around the Building, observe and obey all signs regarding fire lanes and no-parking and driving speed zones and designated handicapped and visitor spaces, and when parking always park between the designated lines.  Landlord reserves the right to tow away, at the expense of the owner, any vehicle which is improperly parked or parked in a no-parking zone or in a designated handicapped area, and any vehicle which is left in any parking lot in violation of the foregoing regulation.  All vehicles shall be parked at the sole risk of the owner, and Landlord assumes no

responsibility for any damage to or loss of vehicles except to the extent arising out of the negligence or willful misconduct of Landlord, the managing agent or any of their respective partners, directors, officers, agents or employees.

24.     Tenant shall be responsible for and cause the proper disposal of medical waste, including hypodermic needles, created by its employees.

It is Landlord's desire to maintain in the Building and Common Areas the highest standard of dignity and good taste consistent with comfort and convenience for tenants. Any action or condition not meeting this high standard should be reported directly to Landlord. Landlord reserves the right to make such other and further rules and regulations as in its judgment may from time to time be necessary for the safety, care and cleanliness of the Building and Common Areas, and for the preservation of good order therein. In the event of any conflict between these Rules and Regulations and the terms of the Lease, the terms of the Lease shall control in every instance.

<u>**EXHIBIT E**</u>

**FORM OF IRREVOCABLE LETTER OF CREDIT**

Duke Realty Limited Partnership
c/o Duke Realty Corporation
Attention: Florida Market Attorney
3715 Davinci Court, Suite 300
Peachtree Corners, Georgia  30092


Duke Realty Limited Partnership
c/o Duke Realty Corporation
600 East 96th Street, Suite 100
Indianapolis, Indiana  46240
Attention: General Counsel

Ladies and Gentlemen:

      At the request and on the instructions of our customer, Elizabeth Arden, Inc. (the "Applicant"), we hereby establish this Irrevocable Letter of Credit No. _____ (the "Letter of Credit") in the amount of $_____ in your favor.  This Letter of Credit is effective immediately and expires on _____.  This Letter of Credit will be automatically renewed (without amendment) for additional one (1) year periods unless we provide at least thirty (30) days' notice to you (at both addresses set forth above) by certified mail or national courier service that we elect not to renew this Letter of Credit for such additional period.  No extension will be granted, however, which extends the maturity date of this Letter of Credit beyond _____**[at a minimum, 60 days after the end of the lease term]**.

      Funds under this Letter of Credit will be made available to you against receipt by us of (1) a sight draft in the form of Annex A attached hereto and (2) your drawing certificate in the form of Annex B attached hereto, in each case appropriately completed and purportedly signed by one of your authorized officers.

      Presentation of any such sight draft and drawing certificate shall be made at our office located at [PRESENTATION OFFICE ADDRESS], Attention: _____, telecopy number (____) _____, during our banking hours of _____ a.m., Eastern Time to _____ p.m., Eastern Time.  Presentation hereunder may also be made in the form of facsimile transmission of the appropriate sight draft and drawing certificate to the preceding address and telecopy number.

      If a sight draft and drawing certificate are presented hereunder by sight or by facsimile transmission as permitted hereunder, by 11:00 a.m., Eastern Time, and provided that such sight draft and drawing certificate conform to the terms and conditions of this Letter of Credit, payment shall be made to you, or to your designee, of the amount specified, in immediately available funds, not later than 2:00 p.m., Eastern Time, on the same day.  If a sight draft and a drawing certificate are presented by you hereunder after the time specified above, and provided that such sight draft and drawing certificate conform to the terms and conditions of this Letter of Credit, payment shall be made to you, or to your designee, of the amount specified, in immediately available funds, not later than 2:00 p.m., Eastern Time,

on the next business day.  If a demand for payment made by you hereunder does not, in any instance, conform to the terms and conditions of this Letter of Credit, we shall give you notice within one (1) business day that the demand for payment was not effected in accordance with the terms and conditions of this Letter of Credit, stating the reasons therefor and that we will upon your instructions hold any documents at your disposal or return the same to you.  Upon being notified that the demand for payment was not effected in conformity with this Letter of Credit, you may attempt to correct any such non-conforming demand for payment to the extent that you are entitled to do so and within the validity of this Letter of Credit.

Partial drawings are allowed under this Letter of Credit.  Any drawing under this Letter of Credit will be paid from our general funds and not directly or indirectly from funds or collateral deposited with or for our account by the Applicant, or pledged with or for our account by the Applicant.

This Letter of Credit is transferable and notwithstanding Article 48 of the Uniform Customs (as defined below), this Letter of Credit may be successively transferred.  Transfer of this Letter of Credit to a transferee shall be effected only upon the presentation to us of the original of this Letter of Credit accompanied by a certificate in the form of Annex C.  Upon such presentation we shall transfer the same to your transferee or, if so requested by your transferee, issue a letter of credit to your transferee with provisions consistent with, and substantially the same as, this Letter of Credit.

This Letter of Credit shall be subject to the International Standby Practices (1998), International Chamber of Commerce Publication No. 590 (the "ISP98"), which is incorporated into the text of this Letter of Credit by this reference.  This Letter of Credit shall be deemed to be issued under the laws of the State of Florida and shall be governed by and construed in accordance with the law of the State of Florida with respect to matters not governed by the ISP 1998 and matters on which the ISP 1998 and the laws of the State of Florida are inconsistent.

Very truly yours,

[ISSUING BANK]

By:_____

Name:_____

Title:_____

ANNEX A

SIGHT DRAFT

[Date]

At Sight

Pay to the order of _____ the sum of _____ and _____ /100 Dollars ($_____) drawn on [ISSUING BANK], as issuer of its Irrevocable Letter of Credit No. _____ dated _____, 20___ .

DUKE REALTY LIMITED PARTNERSHIP, an Indiana limited partnership

By:  Duke Realty Corporation, an Indiana corporation, its sole general partner

By:_____
Name:_____
Title:_____

<u>ANNEX B</u>

DRAWING CERTIFICATE

[Date]

[ISSUING BANK]
[ADDRESS]
Attention: _____

      Re:     Irrevocable Letter of Credit No. (the "Letter of Credit") For the Account of Evolution
               Lighting, LLC (the "Applicant")

Ladies and Gentlemen:

The undersigned, Duke Realty Limited Partnership (the "Beneficiary") hereby certifies that:

      1)     The Beneficiary is the lessor under that certain Office Lease dated _____, 20___,
as amended, between the Beneficiary, as lessor, and the Applicant, as lessee (the "Lease").

      2)     The Beneficiary is entitled to payment under the Letter of Credit in the amount of
$_____ by reason of the following condition (mark only one):

     _____    The Applicant has defaulted under the Lease.
     _____    The expiration date of the Letter of Credit is less than 45 days from the date of this
            Certificate.

      3)     Please direct payment under the Letter of Credit by wire transfer to:

              [Depository Bank]
              [Depository Bank Address]
              ABA No. _____
              Acct. No. _____

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Certificate.

                        DUKE REALTY LIMITED PARTNERSHIP, an Indiana
                        limited partnership

                        By:   Duke Realty Corporation, an Indiana corporation, its
                              sole general partner

                            By:_____
                            Name:_____
                            Title:_____

<u>ANNEX C</u>

NOTICE OF TRANSFER

[Date]

[ISSUING BANK]
[ADDRESS]
Attention: _____

      Re:    Irrevocable Letter of Credit No. _____ (the "Letter of Credit") For
            the Account of Evolution Lighting, LLC

Ladies and Gentlemen:

      You are hereby directed to transfer and endorse the Letter of Credit to _____
(the "Transferee") or to issue in accordance with the terms of the Letter of Credit, a new letter of credit to
the Transferee having the same terms as the Letter of Credit.

      We submit herewith for endorsement or cancellation the original of the Letter of Credit.

                  Very truly yours,

                  DUKE REALTY LIMITED PARTNERSHIP, an Indiana
                  limited partnership

                By:  Duke Realty Corporation, an Indiana corporation, its
                    sole general partner

                  By:_____
                  Name:_____
                  Title:_____

# Exhibit "2"

DocuSign Envelope ID: C30DDD32-FB57-472C-A18D-26C7E4C6279B

<u>**FIRST AMENDMENT TO LEASE**</u>

THIS FIRST AMENDMENT TO LEASE, (this "**Amendment**") is made and entered into as of the 15 day of June, 2020 ("**Effective Date**"), by and between **PEMBROKE POINTE OFFICE LLC**, a Florida limited liability company (the "**Landlord**") and **LUCIDITY LIGHTS, INC.**, a Delaware corporation (the "**Tenant**").

**R E C I T A L S:**

A.   Duke Realty Limited Partnership (the "**Original Landlord**") and Evolution Lighting, LLC (the "**Original Tenant**"), entered into that certain Office Lease dated March 10, 2017, a true, complete and accurate copy of which is attached hereto as **Exhibit "A"**, (the "**Lease**") for certain leased premises (the "**Original Premises**") located at Suite 100 of the building located at 880 Southwest 145th Avenue, Pembroke Pines, Florida 33027, and commonly known as Pembroke Pointe 880, all as more particularly set forth in the Lease.

B.   Landlord has heretofore succeeded to all of the right, title and interest of Original Landlord as the landlord under the Lease.

C.   Tenant has heretofore succeeded to all of the right, title and interest of Original Tenant as the tenant under the Lease pursuant to the Assignment (as defined below).

D.   Tenant has had assigned to it any and all of Original Tenant's right, title, interest and obligations in and to the Lease and the Security Deposit, and Tenant has assumed any and all obligations and liabilities to and under the Lease, as more fully set forth herein.

E.   Landlord and Tenant desire to amend the Lease on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the respective receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree, as follows:

1.   **Assignment and Assumption**. From and after the Effective Date, Tenant has accepted an assignment from the Original Tenant of the Lease of even date herewith (the "Assignment"), and Tenant has and hereby assumes (a) all of the Original Tenant's rights, title and interest in and to the Lease, provided, however, Tenant shall provide its own letter of credit to stand in place of the Security Deposit (the "**LOC**"), and (b) all of the Original Tenant's obligations and liabilities arising thereunder. Tenant agrees to expressly assume all obligations as tenant under the Lease, and agrees to keep, perform, and fulfill all of the terms, covenants, conditions, and obligations of the Original Tenant under the Lease. Tenant agrees to deliver to Landlord a fully executed copy of the Assignment within thirty (30) days of the date of execution of this Amendment, and the failure by Tenant to timely provide same shall be considered a default under the Lease.

2.   **Security Deposit. Transfer of Letter of Credit**. "Security Deposit" means that certain security deposit described in the Lease. Prior to or simultaneously with the execution and

1

DocuSign Envelope ID: C30DDD32-FB57-472C-A18D-26C7E4C6279B

delivery by Tenant of this Amendment, Tenant agrees to deliver to Landlord evidence that the LOC has been transferred to Landlord, as the Beneficiary of such Letter of Credit, and that Landlord has approved such transfer.  Tenant agrees to deliver to Landlord, as reasonably requested, such documentation to evidence and memorialize the LOC to Landlord, including, without limitation, delivery to Landlord of the original LOC.

3.   **Lease Commencement Date**. Section 2.01 of the Lease is hereby deleted in its entirety, and replaced, as follows:

"<u>Section 2.01</u>. <u>Lease Term</u>. The Lease Term shall commence as of September 5, 2017 (the "Commencement Date")."

4.   **Notices**. Section 1.01(l) of the Lease is hereby deleted in its entirety, and replaced, as follows:

"Section 1.01(l)        Address for notices and payments are as follows:

| | |
|---|---|
| To Landlord: | Pembroke Pointe Office LLC |
| | 175 SW 7th Street, Suite 2112 |
| | Miami, Florida 33130 |
| | <u>Attn</u>: Alejandro Velez |
| | Email: avelez@midtown-realty.com |
| | |
| With a copy to: | Cohen Pessoa & Fernandez PLLC |
| | 300 Sevilla Avenue, Suite 215 |
| | Coral Gables, Florida 33134 |
| | <u>Attn</u>: Harvey J. Cohen, Esq. |
| | Email: harvey@cfplegal.com |
| | |
| To Tenant: | Lucidity Lights, Inc. |
| | 56 Roland St., Suite 300 |
| | Boston, Massachusetts 02129" |

5.   **Indemnification; Estoppel; Waiver of Claims**. Tenant hereby indemnifies and agrees to defend and hold harmless Landlord from and against any and all liabilities, obligations, claims, costs and expenses whatsoever which Tenant may incur or suffer arising under or on account of the Lease occurring or alleged to have occurred prior to the Effective Date. Tenant hereby represents, warrants and agrees that as of the effective date of this Amendment: (i) there exists no breach, default or event of default by Landlord under the Lease, or any event or condition which, with notice or passage of time or both, would constitute a breach, default or event of default by Landlord under the Lease; (ii) the Lease continues to be a legal, valid and binding agreement and obligation of Tenant, and (iii) Tenant does not have any current offset or defense to its performance or obligations under the Lease. Tenant hereby waives and releases all demands, charges, claims, accounts or causes of action of any nature against Landlord or Landlord's employees nor agents, including without limitation, both known and unknown demands, charges,

2

DocuSign Envelope ID: C30DDD32-FB57-472C-A18D-26C7E4C6279B

claims, accounts, and causes of action that have previously arisen out of or in connection with the Lease.

      6.    **No Other Agreements**. This Amendment sets forth all of the terms, conditions and understandings between Landlord and Tenant with respect to the subject matter hereof, and there are no terms, conditions or understandings either oral or written between the parties hereto with respect to the subject matter hereof other than as set forth herein. No alteration, amendment, change or addition to this Amendment shall be binding unless reduced to writing and signed by all parties hereto.

      7.    **Ratification.** All of the terms, covenants and conditions of the Lease shall remain the same and continue in full force and effect, and shall be deemed unchanged, except as such terms, covenants and conditions of the Lease have been amended or modified by this Amendment, and this Amendment shall, by this reference, constitute a part of the Lease and its terms and conditions shall govern and control in the event of any conflict between the terms of the Lease before inclusion of this Amendment, and the terms and conditions of this Amendment.

      8.    **Miscellaneous**. **Except as modified herein, the Lease and all of the terms and provisions thereof shall remain unmodified, binding and in full force and effect as originally written.** In the event of any conflict or inconsistency between the provisions of the Lease and the provisions of this Amendment, the provisions of this Amendment shall control. All capitalized terms used herein but not defined herein which are defined in the Lease shall have the same meaning for purposes hereof as they do for purposes of the Lease. The Recitals set forth above in this Amendment are hereby incorporated by this reference. This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective beneficiaries, successors and assigns.

      9.    **Counterpart Execution**. This Amendment may be executed in one or more counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same instrument.

*{Signature Pages to Follow – Remainder of Page Intentionally Left Blank}*

3

DocuSign Envelope ID: C30DDD32-FB57-472C-A18D-26C7E4C6279B

IN WITNESS WHEREOF, the undersigned parties have executed and delivered this Amendment as of the day and year first above written.

WITNESS/ATTEST:

By: _Patricia Wickmann_
      Name: _Patricia Wickmann_

By: _____
      Name: _____

LANDLORD:

**PEMBROKE POINTE OFFICE LLC**, a
Florida limited liability company

By: _____
Name: Alejandro Velez
Title: Manager

WITNESS/ATTEST:

By: _____
      Name: _Scott Almquist_

By: _____
      Name: _____

TENANT:

**LUCIDITY LIGHTS, INC.** a Delaware
corporation

By: _Brad MacMullin_
      A743E74BEC91409
Name: Brad MacMullin
Title: VP Finance

4

DocuSign Envelope ID: C30DDD32-FB57-472C-A18D-26C7E4C6279B

**Exhibit "A"**

Lease

[See Attached]

# Exhibit "3"

**PEMBROKE POINTE OFFICE LLC**
**C/O TORBURN MANAGEMENT LLC**
**7800 W. SUNRISE BLVD.**
**PLANTATION, FL 33322**

VIA EMAIL, FEDEX DELIVERY & HAND DELIVERY

January 26, 2022

RE:     **THREE DAY NOTICE TO PAY DELINQUENT RENT**

To Whom It May Concern:

**YOU ARE HEREBY NOTIFIED** that pursuant to the Lease Agreement dated March 10, 2017 and further amended by the First Amendment dated June 15, 2020, by which you hold possession of the property located at 880 SW 145th Ave, Suite 100, Pembroke Pines, FL 33317 you are indebted to **PEMBROKE POINTE OFFICE LLC** in the amount of $33,437.91 for the rent and use of the premises.

**DEMAND IS HEREBY MADE FOR SAID SUM OR POSSESSION** of the above-described premises **WITHIN THREE (3) DAYS** from the delivery date of this notice (excluding Saturday, Sunday, and legal holidays), to wit: on or before January 31st, 2022.

**NOTICE**, you are required to pay said delinquent sum in full or deliver possession of the premises to the undersigned; otherwise, legal proceedings will be commenced against you and all guarantors (i) to recover possession of the Premises; (ii) to accelerate all sums due under the Lease and recover damages as allowed by the Lease and Florida Law (iii) to recover reasonable attorney's fees and court and other costs; all in connection with your default under the Lease.  Be advised that your vacating of the Premises will not relieve you of your obligation to pay all sums due and owing to the Landlord for the remainder of the Lease term.

**PLEASE GOVERN YOURSELF ACCORDINGLY.**

Sincerely,

Pembroke Pointe Office LLC

Heather Klem
General Manager